PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1733
_____

UNITED STATES OF AMERICA

v.

KEENAN DANAN QUINN,

Appellant

_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-09-cr-00720-002)
District Judge:  Honorable Petrese B. Tucker

_____

Argued En Banc February 20, 2013
_____

Before:  McKEE, <u>Chief Judge</u>, SLOVITER, SCIRICA,
RENDELL, AMBRO, FUENTES, SMITH, FISHER,
CHAGARES, JORDAN, HARDIMAN,
GREENAWAY, Jr., VANASKIE, and
ALDISERT, <u>Circuit Judges</u>

(Opinion filed: August 14, 2013 )

Peter Goldberger, Esquire (Argued)
Pamela A. Wilk, Esquire
50 Rittenhouse Place
Ardmore, PA 19003

Edward C. Meehan, Jr., Esquire
Edward C. Meehan, Jr. & Associates
211 North 13th Street, Suite 701
Philadelphia, PA 19107

      Counsel for Appellant

Zane David Memeger, Esquire
United States Attorney
Robert A. Zauzmer, Esquire (Argued)
 Assistant United States Attorney
David L. Axelrod, Esquire
Assistant United States Attorney
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

      Counsel for Appellee

Ellen C. Brotman, Esquire
Erin C. Dougherty, Esquire
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street, 28th Floor
Philadelphia, PA 19109

Jenny Carroll, Esquire
Seton Hall University School of Law
One Newark Center
Newark, NJ 07102

Amicus Curiae Counsel
National Association of Criminal Defense Lawyers

_____

OPINION  OF  THE  COURT

_____

AMBRO, <u>Circuit Judge</u>, with whom McKEE, <u>Chief Judge</u>, SLOVITER, SCIRICA, RENDELL, FUENTES, SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN, GREENAWAY, Jr., VANASKIE, and ALDISERT, <u>Circuit Judges</u>, join.

Keenan Quinn appeals his jury conviction for aiding and abetting codefendant Shawn Johnson in an armed bank robbery.  Quinn's defense was that, when he drove Johnson to National Penn Bank on the morning of the robbery, he did not know that Johnson intended to rob a bank teller at gunpoint. Quinn hoped Johnson would testify on his behalf at trial, but Johnson—who was awaiting sentencing on the robbery charges—invoked his Fifth Amendment protection against self-incrimination and refused to testify.  The District Court's refusal of Quinn's request to immunize Johnson so he could testify was, Quinn contends, an error, for without it he was unable to rebut the Government's accusations against him.

Quinn also alleges (though belatedly) prosecutorial misconduct.  Specifically, he asserts that the Government

postponed Johnson's sentencing until after Quinn's trial to induce Johnson to invoke his Fifth Amendment privilege.

We have recognized two situations in which a criminal defendant may be entitled to have a defense witness receive immunity for his testimony. The first, grounded in prosecutorial misconduct, occurs when the Government acts "with the deliberate intention of distorting the judicial fact finding process" (for example, by threatening a defense witness). *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978); *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976). If prosecutorial misconduct occurs, the charges are dismissed unless the Government chooses to immunize the witness at a new trial.

We recognized a second situation in *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980)— even without evidence of prosecutorial misconduct, if the Government has refused to immunize the witness, the defendant is entitled to immunity for his witness if the testimonial evidence is "clearly exculpatory and essential to the defense case and . . . the government has no strong interest in withholding use immunity." *Id.* at 974. If those requirements (detailed in a five-part test) are met, the District Court, as a new remedy accorded by *Smith*, may on its own authority immunize that witness to allow his testimony. *Id.* at 971–72.

No statute or Supreme Court ruling authorizes judicial grants of immunity for a defense witness (called for convenience judicial use immunity). We are the only Court of Appeals that permits a trial court to immunize a defense witness. Every other Court of Appeals has rejected this

4

theory of judicial power. Today we do so as well, and overturn that part of *Smith* that recognizes judicial grants of immunity. Immunity is a statutory creation, bestowed by Congress on the Executive Branch through the federal witness immunity statute, 18 U.S.C. §§ 6002, 6003. The decision to immunize a witness to obtain his testimony is a core prosecutorial function, as immunizing necessarily involves weighing the public's need for testimony against the risk that immunity will inhibit later prosecution of criminal wrongdoing. We, in our corner of the Judiciary, now step away from our reach into this prosecutorial realm.

Though we abandon the judicial use immunity remedy created in *Smith*, we retain its five-part test for determining whether the Government's refusal to grant defense witness immunity denies a defendant due process. We created this test in *Smith* because we feared our then-existing test for prosecutorial misconduct—acts taken with an intent to distort the factfinding process—did not ensure the defendant's right to present an effective and meaningful defense when the prosecutor refused to immunize a witness. *Smith* asks whether the Government has refused to immunize a witness in order to keep clearly exculpatory and essential testimony from trial without a strong countervailing reason. If so, this is a type of prosecutorial misconduct. The *Smith* test thus complements our existing prosecutorial misconduct test. However, the remedy for a due process violation, rather than intruding into the prosecutor's province by judicial grants of immunity, is a retrial where the Government can cure the distortion caused by its wrongdoing or face dismissal of the relevant charges.

5

Applying both the prosecutorial misconduct test that existed before and after *Smith* (acts taken with the deliberate intent to distort the factfinding process) and the complementary test we created in *Smith* (exclusion of clearly exculpatory and essential testimony without a strong countervailing government interest) to Quinn's case, we hold that the Government did not engage in wrongdoing. We cannot conclude it deliberately distorted the factfinding process by delaying Johnson's sentencing. No evidence demonstrates that the Government's action had any effect on Johnson's decision to invoke his Fifth Amendment right not to incriminate himself by his testimony. Nor did the Government keep clearly exculpatory testimony from Quinn's trial by refusing to immunize Johnson. We thus affirm.

## I. Facts and Procedural History

### A. The Bank Robbery

On the morning of August 27, 2009, Quinn met Johnson in a parking lot at the Henderson Square shopping mall in King of Prussia, Pennsylvania. Quinn drove Johnson across the parking lot to the National Penn Bank, located within the same shopping mall. While Johnson went into the bank, Quinn drove his car behind another store, and out of sight of those in the bank.

Once inside, Johnson handed a check to one of the tellers. When she requested identification from Johnson, the teller realized Johnson had a gun pointed at her and that a note written on the back of the check demanded money. Johnson took several thousand dollars in cash from the teller

and another bank employee transferring cash from the bank vault. Unknown to Johnson, the money he was given contained a global positioning system ("GPS") tracker hidden inside a bundle of bills. Johnson left the bank and returned to Quinn, who was still waiting in his car behind the nearby store, and the two drove away.

Quinn and Johnson went to a nearby townhouse owned by Quinn's aunt. There, Johnson discovered the GPS tracker and attempted to disable it by hitting it and submerging it in a bowl of water. He was unsuccessful. The Upper Merion Police Department used the tracker to locate the men at the townhouse, where both shortly surrendered. Police recovered a gun, the GPS tracker, and approximately $9,000 in cash.

## B.     The Investigation and Indictment

Law enforcement officers interviewed both Quinn and Johnson that afternoon. Quinn told the officers that he did not know that Johnson planned to rob the National Penn Bank. Johnson confessed to the robbery, as well as another bank robbery he had committed a month earlier and a fraudulent check cashing scheme. He also told police that Quinn did not know he (Johnson) intended to rob National Penn. Beyond that statement, Johnson "was hesitant to talk about Quinn because Quinn is the brother of [Johnson's] fiancee."

The United States Attorney for the Eastern District of Pennsylvania indicted both Quinn and Johnson for armed bank robbery in violation of 18 U.S.C. § 2113(d), and using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Johnson was also

7

indicted for the earlier bank robbery and for being a felon in possession of a gun in violation of 18 U.S.C. § 922(g)(1). Johnson pled guilty to all of the charges in May 2010, and was awaiting sentencing in August 2010 when Quinn's trial was scheduled to begin.

### C. Johnson's Assertion of His Fifth Amendment Privilege

Prior to the start of Quinn's trial, his counsel discovered that Johnson had been transferred to an out-of-state prison. Quinn requested, and was granted, a continuance so that Johnson could be returned to Pennsylvania and be available to testify.

In response to this continuance, the Government filed a motion to postpone Johnson's sentencing. It apparently was concerned that Johnson, who had already pled guilty to the robbery, could shield Quinn from blame without any additional cost to himself by testifying that Quinn was not involved in that crime. By delaying Johnson's sentencing until after his testimony, the Government contended it would retain the ability to present to the sentencing Court any testimony by Johnson it believed to be perjurious.

> [I]f Keenan Quinn calls [Johnson] as a witness and [Johnson] does not invoke his right against self-incrimination, it is possible, if not probable, that [Johnson] will commit perjury. Thus . . . his testimony will likely have a direct effect on his [sentencing] guidelines and the Court's analysis under 18 U.S.C. § 3553(a).

Johnson's only response to the Government's motion was to inform the Court that if either "the codefendant's counsel or the government attempts to call Mr. Johnson as a witness at the trial of the codefendant, Mr. Johnson will assert his right to remain silent under the Fifth Amendment."

As his reply to the Government's motion to delay and Johnson's statement that he intended to invoke the Fifth Amendment, Quinn filed a motion *in limine* asking the Court to exercise its authority under our holding in *Smith* to immunize Johnson so he could testify on Quinn's behalf without fear of prosecution or repercussion at sentencing. The Government opposed the motion. Following briefing and oral argument, the Court denied Quinn's request, and declined to reconsider that ruling when Quinn renewed the motion at the close of evidence.

### D.    Quinn's Trial

At trial, the Government introduced phone records showing that Quinn called Johnson once the day before the robbery and five times in a little over two hours on the morning of the robbery. Evidence of these calls, though deleted from the call history on Quinn's phone before it was taken by the police, was revealed through the phone company's documentation. The Government also presented testimony from two of Quinn's former cellmates, Anthony Bennett and Nicholas Mason. Bennett testified of conversations with Quinn whereby the latter had planned a crime in which he acted as the driver and hoped to beat the charges because his codefendant would "take all of the charges." Mason testified that Quinn admitted that he and a codefendant planned a bank robbery where "[Quinn] stayed

parked at a separate location so he would not be linked to the crime."

Quinn testified in his own defense. He told the jury that he called Johnson once on the morning of the robbery to make plans to meet for breakfast. He claimed that he began to drive Johnson to his aunt's house, where they intended to spend the morning, when Johnson directed him to pull in front of the bank's entrance. As he got out of the car, Johnson told Quinn to wait behind a nearby store. Quinn stated that he believed Johnson was going to cash a fraudulent check at the bank, something Johnson had done before, but did not know that Johnson was going to rob the bank at gunpoint.

Johnson did not testify. His statement to police that Quinn was not aware of the planned robbery was excluded as hearsay.

After a four-day trial, the jury found Quinn guilty of aiding and abetting a bank robbery and carrying a firearm in relation to a crime of violence. His sentence was 147 months' imprisonment and monetary penalties.

### E.    This Appeal

This appeal followed. Quinn argues that the District Court erred by not exercising its authority under *Smith* to immunize Johnson's testimony, thus denying Quinn the opportunity to present an effective defense. He also claims for the first time that the prosecution's request to postpone Johnson's sentencing until after Quinn's trial was intended to induce Johnson to invoke his Fifth Amendment privilege, a

deliberate distortion of the factfinding process and thus an act of prosecutorial misconduct. As a remedy, Quinn contends his conviction should be vacated and the charges dismissed unless Johnson is given immunity to testify at a retrial.

In response to Quinn's appeal, the Government questioned our unique jurisprudence in this area. We *sua sponte* elected to hear this case *en banc* to "reconsider the . . . theory of judicial immunity" recognized in *Smith*. The parties filed supplemental briefs, and we heard argument *en banc*.

## II.   Judicial Use Immunity

### A.   Our Holding in *Smith*

In *Smith*, three defendants were charged with assault and robbery of a man named Phipps. The Government's case centered on Phipps' identification of the defendants as his assailants. During the investigation following the assault, however, a man named Sanchez told police that he and several others—none of whom was among the defendants—were responsible for the crime. *Smith*, 615 F.2d at 966–67.

Defendants called Sanchez as a witness at their trial, but he refused to testify on the basis of his Fifth Amendment privilege against self-incrimination. Because he was a juvenile at the time of the offense, Sanchez was subject to the exclusive jurisdiction of the Virgin Islands Attorney General, who offered to grant immunity to Sanchez if, as a prosecutorial courtesy, the United States Attorney prosecuting the case consented. *Id.* at 967. When the U.S. Attorney refused to consent, the trial proceeded without Sanchez's

11

testimony or his hearsay statements to police, and all three defendants were convicted. *Id.*

Citing our opinion in *Morrison*, 535 F.2d 223, we held that if the Government had refused immunity "with the deliberate intention of distorting the factfinding process, then the district court should enter a judgment of acquittal as to defendants . . . unless the government consents to grant statutory use immunity to [the witness]." *Smith*, 615 F.2d at 969. Our Court in *Smith* called this "statutory immunity," *id.*, though it is more commonly referred to as the prosecutorial misconduct theory. While rarely the basis of a retrial order, this theory provides a valuable safeguard against prosecutorial overzealousness infringing on the fair trial ensured to a criminal defendant.

*Smith* went further and held that the trial court could itself "grant judicial immunity to the witness" if necessary to "vindicate the defendant's constitutional right to a fair trial." *Id.* at 974. We held that court-granted immunity could be used to ensure that the defendant was able to present an effective defense if the Government inexplicably refused to immunize a defense witness with exculpatory and essential testimony. We first considered this "effective defense" theory in *United States v. Herman*, 589 F.2d 1191 (3d Cir. 1978), but did not establish the test and remedy until two years later in *Smith*.[1] We refer to this power as "judicial use

---

[1] The idea of immunizing a witness as necessary to secure the defendant's due process right is often traced to a footnote in then-Judge Warren Burger's opinion in *Earl v. United States*, 361 F.2d 531, 534 n.1 (D.C. Cir. 1966). The theory that a defendant could have a due process right to witness testimony

immunity" because it involves a court conferring immunity without a request from the Government.

*Smith* recognized that the judicial grant of immunity intruded on the Government's statutory authority to immunize witnesses and prosecutorial discretion to prioritize enforcement of the laws. Thus we held that "opportunities for judicial use of this immunity power must be clearly limited." *Smith*, 615 F.2d at 972. We created a five-part test—witness immunity could be granted only if "[1] properly sought in the district court; [2] the defense witness [is] available to testify; [3] the proffered testimony [is] clearly exculpatory; [4] the testimony [is] essential; and [5] there [are] no strong governmental interests which countervail against a grant of immunity." *Id.* These factors balance the Government's discretion in prosecutorial decisions and the defendant's right to present a meaningful defense.

## B.   Rejection of Judicial Use Immunity

As noted, we are the only Court of Appeals that has recognized judicial use immunity for witnesses. *United*

---

also gained traction in academic literature. *See, e.g.*, Donald Koblitz, Note, *"The Public Has a Claim to Every Man's Evidence": The Defendant's Constitutional Right to Witness Immunity*, 30 Stan. L. Rev. 1211 (1978); Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses*, 91 Harv. L. Rev. 1266 (1978); Helen M. McCue, Note, *Separation of Powers and Defense Witness Immunity*, 66 Geo. L.J. 51 (1977); Barbara A. Reeves, Note, *A Re-Examination of Defense Witness Immunity: A New Use for Kastigar*, 10 Harv. J. on Legis. 74 (1972).

*States v. Serrano*, 406 F.3d 1208, 1217 (10th Cir. 2005) ("Every other Circuit, save the Third, has . . . held a district court does not have the inherent authority to grant a defense witness use immunity."). Other Courts of Appeals have adopted the prosecutorial misconduct theory, and evaluate whether the Government may be required to immunize a witness if necessary to protect the defendant's right to present an effective defense; but none authorizes a district court to grant immunity on its own authority. *See, e.g.*, *Curtis v. Duval*, 124 F.3d 1 (1st Cir. 1997); *United States v. Turkish*, 623 F.2d 769, 772 (2d Cir. 1980); *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004); *United States v. Thevis*, 665 F.2d 616 (5th Cir. Unit B 1982), *superseded on other grounds by* Fed. R. Evid. 804(b)(6); *United States v. Talley*, 164 F.3d 989 (6th Cir. 1999); *United States v. Herrera-Medina*, 853 F.2d 564 (7th Cir. 1988); *United States v. Bowling*, 239 F.3d 973 (8th Cir. 2001); *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991); *Serrano*, 406 F.3d at 1217–18; *United States v. DiBernardo*, 880 F.2d 1216 (11th Cir. 1989); *United States v. Perkins*, 138 F.3d 421 (D.C. Cir. 1998). They have cited concerns of judicial competency to weigh immunity decisions and the Executive Branch's sole authority to immunize under the federal immunity statute, 18 U.S.C. §§ 6002, 6003. *See, e.g.*, *United States v. Capozzi*, 883 F.2d 608, 614 (8th Cir. 1989) ("Every court of appeals which has considered the question has rejected the Third Circuit's *Smith* holding as being a violation of the doctrine of separation of powers."). Judicial use immunity has also been questioned by members of our Court. *United States v. Bazzano*, 712 F.2d 826, 851 (3d Cir. 1983) (*en banc*) (Adams, J., with Hunter and Becker, JJ., dissenting) ("*Smith* may have expanded judicial power too far.").

It is in this context that we revisit that aspect of *Smith*'s holding whereby courts have the inherent authority to immunize a defense witness.

### C.     Reconsidering Judicial Use Immunity

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Sixth Amendment guarantees a criminal defendant's right "to have compulsory process for obtaining witnesses in his favor." *Id.* amend. VI. Fundamentally, "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

The *Smith* Court based its judicial immunity remedy on the conclusion that the Fifth Amendment's Due Process Clause includes a right to present an effective defense. Although it cited the Sixth Amendment's right to compulsory process, that alone does not entitle a defendant to request immunity for his witnesses. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) ("[T]he Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses."); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . ."); *Diggs v. Owens*, 833 F.2d 439, 444

15

(3d Cir. 1987) ("In general a defendant's Sixth Amendment right of compulsory process gives way when a witness he has subpoenaed invokes his Fifth Amendment privilege against self-incrimination."); *Moussaoui*, 382 F.3d at 467 ("[A] defendant has no Sixth Amendment right to such testimony.").

We held in *Smith* that a court could bestow immunity on a defense witness to guard a defendant's constitutional right to present an effective defense. On revisiting the issue, we no longer believe this is a permissible use of judicial authority. Congress has given the Executive Branch the sole authority to immunize witnesses; giving that power to courts intrudes on prosecutorial decision-making and goes beyond judicial expertise. Moreover, we think the defendant's right to due process is protected by retaining the effective defense test as a complement to our prosecutorial misconduct inquiry.

### 1. *The Statutory Basis of Immunity*

Immunity is a creation of the legislature, the body that defines criminal offenses and their sanctions. It removes "those sanctions which generate the fear justifying invocation of the privilege," *Ullmann v. United States*, 350 U.S. 422, 431 (1956), and is akin to "an act of general amnesty," *Brown v. Walker*, 161 U.S. 591, 601 (1896).

Under the federal witness immunity statute, "no testimony or other information compelled . . . (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." 18

U.S.C. § 6002. This is known variously as use and derivative use, or use and fruits, immunity (shortened to use immunity throughout this opinion). Congress has given the Attorney General the authority to exchange the protection of immunity for otherwise incriminating testimony when, "in his judgment," a witness's testimony "may be necessary to the public interest." § 6003(b). Because this protection "is coextensive with the scope of the [Fifth Amendment] privilege against self-incrimination," a Court can hold an immunized witness in contempt for refusal to testify. *Kastigar v. United States*, 406 U.S. 441, 453 (1972).

Congress granted this authority to the Executive Branch because immunity is a prosecutorial tool. Often those with pertinent knowledge about criminal offenses have engaged in unlawful behavior themselves. Granting immunity enables the Government to elicit testimony that would otherwise be protected by the Fifth Amendment privilege against self-incrimination.

Congress has not given criminal defendants any similar power to seek immunity for their witnesses. Nor has it authorized the federal courts to immunize a witness. Instead, under § 6002 a district court's role is to grant immunity when it is requested by the Attorney General or his designee. Though a court reviews the Government's request for procedural compliance with the statute, it does not consider whether the Government has correctly determined if immunity is in the public interest. *Pillsbury Co. v. Conboy*, 459 U.S. 248, 254 n.11 (1983) ("Congress foresaw the courts as playing only a minor role in the immunizing process . . . ."); *Herman*, 589 F.2d at 1201 ("There is . . . overwhelming judicial and legislative authority for the

17

proposition that review on the merits of a federal prosecutor's decision to grant immunity is barred by statute."); *see also United States v. Taylor*, 728 F.2d 930, 934 (7th Cir. 1984) (describing this review as "ministerial").

There are good reasons for immunity decisions to reside with the Executive Branch. Often the decision to grant or deny immunity impinges on the Government's "broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (internal quotation marks omitted). In any later prosecution, the Government bears a "'heavy burden'" because it must "prove that its evidence against the immunized witness has not been obtained as a result of his immunized testimony." *Turkish*, 623 F.2d at 775 (quoting *Kastigar*, 406 U.S. at 461). In some cases, the Government may have already assembled the evidence it needs, or it can "sterilize" the immunized testimony by isolating those investigating or prosecuting the witness from any incriminating information provided through his testimony. *Smith*, 615 F.2d at 973. But if these precautions are unsuccessful or unavailable, a court's granting immunity to a witness to secure another's criminal conviction may prevent the Government from ever prosecuting the witness for his own criminal behavior.

Courts are not in the best position to decide these prosecutorial tradeoffs. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte*, 470 U.S. at 607; *see Moussaoui*, 382 F.3d at 467 ("Decisions to grant or deny

18

immunity are intimately tied to decisions regarding which perpetrators of crimes will be prosecuted, a core aspect of the Executive's duty to enforce the laws."); *In re Daley*, 549 F.2d 469, 479 (7th Cir. 1977) ("[T]he relative importance of particular testimony to federal law enforcement interests is a judgmental rather than a legal determination, one remaining wholly within the competence of appropriate executive officials."). Giving judges the power to immunize witnesses "would carry the courts into policy assessments which are the traditional domain of the [E]xecutive [B]ranch." *Thevis*, 665 F.2d at 639. As Congress has given the power to immunize a witness solely to the Executive Branch, it is not a power courts can exercise.[2]

---

[2] Our sister Circuits have also expressed a fear that judicially granted immunity "would be subject to abuse" by criminal defendants who could seek immunity for one another, each testifying that the other was not involved, or that one criminal defendant could take the fall for coconspirators by taking full responsibility at the others' trials. *Thevis*, 665 F.2d at 639–40; *Turkish*, 623 F.2d at 775. Though these witnesses subject themselves to perjury prosecution, the perjury statutes likely carry far lower sanctions, and therefore deterrence, than the charged offenses. *Thevis*, 665 F.2d at 640 n.27 ("Nor are we convinced that perjury prosecutions are an adequate deterrent. Successful perjury prosecutions are not common, and in many cases the penalty for the substantive crime will far surpass perjury penalties."). Although we have recognized judicial use immunity for over thirty years and these fears do not appear as a problem to date, we recognize that the possibility of this kind of abuse further highlights the limits of judicial expertise in this area.

### 2. *The Lack of Support for Judicial Use Immunity*

In *Smith*, we justified judicial use immunity as "new only in the sense of its application" in that context. 615 F.2d at 971. We said that "[b]oth the Supreme Court [in *Simmons v. United States*, 390 U.S. 377 (1968),] and this [C]ourt [in *In re Grand Jury Investigation*, 587 F.2d 589 (3d Cir. 1978), and *United States v. Inmon*, 568 F.2d 326 (3d Cir. 1977),] have previously found an inherent judicial power to grant witness immunity." *Id.* We now believe this was too expansive a reading of those cases. *Simmons*, and our cases applying its holding, *Grand Jury* and *Inmon*, permit a court to exclude a criminal defendant's earlier testimony from trial in narrow circumstances. This differs significantly from granting immunity to a defense witness when that witness has invoked the Fifth Amendment.

In *Simmons*, the Supreme Court held that a defendant's testimony in support of his motion to suppress evidence on Fourth Amendment grounds could not be admitted against him on the issue of guilt at his later trial, as it is "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 394. We applied the logic of *Simmons* to hold that a defendant's testimony offered to gain the protection of the Speech and Debate Clause, *Grand Jury*, 587 F.2d at 597, and the Double Jeopardy prohibition, *Inmon*, 568 F.2d at 333, could similarly not be used to prove his guilt at a subsequent trial.

Although the Court's opinion in *Simmons* never uses the word "immunity," courts—including our own—have analogized *Simmons'* protection of testimony given at a

suppression hearing to a grant of immunity. *See, e.g.*, *United States v. Perry*, 788 F.2d 100, 116 (3d Cir. 1986) (noting that "*Simmons v. United States* authorizes the grant of use immunity," thus a defendant could testify at a bail hearing without fear of incrimination); *United States v. Bryser*, 95 F.3d 182, 186 (2d Cir. 1996) (holding that "use immunity under *Simmons*" was not available at a resentencing hearing).

*Simmons* created an exclusionary rule (that is, it excludes a defendant's testimony in an earlier hearing from being used at trial against him) when the criminal defendant would otherwise have to waive at the hearing his Fifth Amendment privilege against self-incrimination. The Supreme Court has not extended *Simmons* beyond those facts. *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010). *Simmons*' reasoning does not reach the facts of *Smith*; neither the defendants in that case nor the defense witness faced a conflict between two constitutional rights. In addition, the protection afforded by the Supreme Court under *Simmons* (the exclusion from his trial of a criminal defendant's testimony at a prior suppression hearing) does not present the same intrusion on prosecutorial discretion as does a judicial grant of immunity to a defense witness. In other words, *Simmons*' exclusionary rule does not extend a court's power to invade the prosecutorial decisions discussed above.

Any possibility that the Supreme Court authorized in *Simmons* a general judicial authority to confer use immunity for non-defendant witnesses is undermined by its subsequent discussions of the authority to immunize witnesses. In cases addressing grants of immunity, it is clear that the Court believes only the Executive Branch, and not the Judiciary, has the authority to immunize a witness. In *Pillsbury*, the Court

21

held that a witness in a civil suit could invoke the Fifth Amendment during a deposition in which he was asked questions identical to those asked and answered under Government-sought immunity before a grand jury. 459 U.S. 248 (1983). Holding that the deposition testimony was not "derived from" the immunized testimony and hence not protected by the grant of immunity, the Court held that the trial court could not compel the witness's incriminating answers because "only the Attorney General or a designated officer of the Department of Justice has authority to grant use immunity," and "Congress gave certain officials in the Department of Justice *exclusive authority* to grant immunities." *Id.* at 248, 253–54, 261 (emphasis added and footnote omitted).

Similarly, in *United States v. Doe* the Government sought to compel document production through a promise not to prosecute but without obtaining immunity under the federal immunity statute. 465 U.S. 605 (1984). The Supreme Court declined "to adopt a doctrine of constructive use immunity," and refused to "extend the jurisdiction of courts to include prospective grants of use immunity in the absence of the formal request that the statute requires." *Id.* at 616. It explained that, under *Pillsbury*, prosecutors had the exclusive authority to grant immunity, as that decision "necessarily involves a balancing of the Government's interest in obtaining information against the risk that immunity will frustrate the Government's attempts to prosecute the subject of the investigation. Congress expressly left this decision exclusively to the Justice Department." *Id.* at 616–17 (citation omitted). In a more recent discussion of immunity, the Court referred repeatedly to the Executive Branch's authority to immunize a witness. *See United States v. Balsys*,

22

524 U.S. 666, 682–83 (1998) ("[T]he government has an option to exchange the stated privilege for an immunity to prosecutorial use of any compelled inculpatory testimony. . . . The only condition on the government when it decides to offer immunity in place of the privilege to stay silent is the requirement to provide an immunity as broad as the privilege itself. . . . [T]he immunity option open to the Executive Branch could be exercised only on the understanding that the state and federal jurisdictions were as one." (citation omitted)).

This language is no doubt *dicta*. Yet "we cannot lightly ignore the force of Supreme Court *dicta.*" *Morrow v. Balaski*, 719 F.3d 160, 169 (3d Cir. 2013) (*en banc*). "The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket." *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000). "Appellate courts that dismiss these expressions . . . increase the disparity among tribunals . . . and frustrate the evenhanded administration of justice . . . ." *Id.* at 612–13 (internal quotation marks omitted).

### 3. *Judicial Use Immunity and Kastigar*

Quinn urges us to uphold judicial use immunity, arguing that courts do not need authority to "grant" immunity. Instead, he believes the judicial power to compel testimony necessary to a defendant's defense, on its own, carries immunity for that testimony. Quinn reads *Kastigar v. United States*, 406 U.S. 441 (1972), to hold that testimony, once compelled, is necessarily immunized. He explains "the Self-Incrimination Clause by its own force confers immunity for

23

direct and indirect uses of the compelled testimony against . . . that witness." Appellant's Supplemental Br. at 6.

That is not correct. In *Kastigar*, two witnesses were immunized under 18 U.S.C. § 6002 but refused to testify before a grand jury. 406 U.S. at 442. They contended that the statutory protection was not sufficient to supplant the privilege and compel their testimony. The District Court held them in contempt and the Supreme Court upheld that order. *Id.* at 453. "[S]uch immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Id.* Testimony that would otherwise incriminate can only be compelled—that is, sought subject to contempt if not given—after the threat of criminal sanction is lifted. That testimony is not automatically immunized because it is compelled; rather, if the witness claims the privilege, his testimony can be compelled because the federal immunity statute protects him from incrimination as a result of his testimony, the same protection afforded by the Fifth Amendment.

As we discussed above, only the Government has statutory authority to seek immunity. And only when testimony is protected by immunity granted by the Government can a court compel that testimony. The authority of a court to immunize a witness cannot be assumed from *Kastigar*.

\*    \*    \*    \*    \*

We know of no precedent (save *Smith*) to support use immunity grants by the Judiciary, as that right is reserved to

24

the Executive Branch. In addition, we do not believe that judicial use immunity is necessary to protect the constitutional rights of the accused. As explained in the next section, we believe that, when understood in its historical context, *Smith* proscribed prosecutorial misconduct and the test we created there to assess claims of misconduct remains both useful and worth keeping. Thus, though we abandon judicial use immunity as a remedy, we keep the protection of due process provided through the test created in *Smith*.

## III.　The Prosecutorial Misconduct Theory

The prosecutorial misconduct theory we recognized prior to *Smith* holds that the Government violates a defendant's due process right to a fair trial if it acts with the deliberate intention of distorting the factfinding process, such as by interfering with a defense witness through threats and intimidation. Because it looks to Government action, this test is difficult to apply when the Government declines to grant immunity to a defense witness. *Smith* crafted a new five-part test to address instances of Government refusal to immunize, with the aim of ensuring that a defendant is able to present a defense free from improper Government intrusion.

### A.　Our Holding in *Morrison*

The first case in our Circuit involving the prosecutorial misconduct theory was *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976). We held that the Government's interference with a defense witness's testimony violated the defendant's guarantee of due process. *Id.* at 228. Morrison's girlfriend intended to testify that she, and not he, engaged in the charged criminal conspiracy to distribute hashish. Over

25

the course of the trial, the prosecutor sent several messages to the witness warning her that she could be charged for the drug crimes and perjury on the basis of her testimony. *Id.* at 225. The night before her testimony, the prosecutor subpoenaed the witness and interviewed her in his office. Accompanied by the law enforcement officers involved in the case, he again warned her of the dangers of testifying. These warnings had their intended effect. When called to testify, Morrison's girlfriend invoked her Fifth Amendment privilege against self-incrimination. *Id.* at 226.

We held that the prosecutor's "repeated warnings[,] which culminated in a highly intimidating personal interview," had "interfered with the voluntariness of [the witness's] choice and infringed [the] defendant's constitutional right to have her freely-given testimony." *Id.* at 227–28. Due process protects the defendant's "right . . . to have [his] witness available as he finds him." *United States v. Herman*, 589 F.2d 1191, 1199 (3d Cir. 1978). We vacated Morrison's conviction and held that, if the witness invoked a privilege against self-incrimination during a retrial, the charges against Morrison should be dismissed unless the Government immunized the witness's testimony under 18 U.S.C. § 6002. *Morrison*, 535 F.2d at 229.

Our holding in *Morrison* followed from the Supreme Court's holding in *Webb v. Texas*, 409 U.S. 95 (1972). There, a trial court

> gratuitously singled out [the only defense] witness for a lengthy admonition on the dangers of perjury. . . . [T]he judge implied that he expected [the witness] to lie, and went on to

26

> assure him that if he lied, he would be
> prosecuted and probably convicted for perjury,
> that the sentence for that conviction would be
> added on to his present sentence, and that the
> result would be to impair his chances for parole.

*Id*. at 97. The Supreme Court held that the judge's remarks "effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.* at 98.

Other courts have interpreted *Webb* similarly to hold that "[v]arious prosecutorial and judicial actions aimed at discouraging defense witnesses from testifying deprive a defendant of [his due process] right." *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001); *see also United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988) ("'[The prosecutor]'s warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify.'" (quoting *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982))); *United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (prosecutor's "eleventh hour call" to primary defense witness "suggesting that she would be well-advised to remember the Fifth Amendment" is a due process violation under *Webb* that entitles the defendant to a new trial).

## B.     Prosecutorial Misconduct Beyond *Morrison*

Following *Morrison*, we defined prosecutorial misconduct as actions taken "with the deliberate intention of distorting the judicial factfinding process." *Smith*, 615 F.2d at 968; *Herman*, 589 F.2d at 1204. This deliberate distortion

27

test applies when the Government has taken steps to interfere with the testimony of a witness who would otherwise be available to the defense. For example, the prosecution has engaged in misconduct if the defendant can show that the Government's "[i]ntimidation or threats . . . dissuade[d] a potential witness from testifying"—that is, "the [G]overnment's conduct . . . 'substantially interfered' with a witness's choice to testify." *Lambert v. Blackwell*, 387 F.3d 210, 260 (3d Cir. 2004).

But we have also used the deliberate distortion test in situations where prosecutors did not engage in overt threats or intimidation. In *Herman*, we considered whether the Government's selective immunization of prosecution witnesses, but not defense witnesses, violated the defendant's due process rights. 589 F.2d at 1203–04. Because the Government's decision to immunize some witnesses and not others was based on its decision to prosecute them, and not on their testimony at Herman's trial, we discerned no misconduct. *Id*. In *Smith*, we asked whether the prosecutor's refusal to permit a defense witness to testify under a grant of immunity, when there was no interest in prosecuting him, was a deliberate effort to distort the factfinding process. *Smith*, 615 F.2d at 969. We recognized that when the Government declines to seek immunity for a defense witness, it is difficult for a defendant to prove that the prosecution acted with the deliberate intention of distorting the factfinding process. Thus in *Smith* we also created a new five-factor test that focused on whether the defendant "is prevented from presenting exculpatory evidence which is crucial to his case." *Id*.

28

Although we characterized this test as distinct from an inquiry into prosecutorial misconduct, it is nonetheless about the Government's trial decisions. We wanted to know if the prosecutor was keeping exculpatory and essential testimony from trial solely to gain a tactical advantage against the accused. If there were a governmental reason, unrelated to the defendant's trial, for refusing immunity, we would not interfere with that decision. If, however, the Government had no strong reason to keep exculpatory testimony from trial, we could overturn a resulting conviction. *See United States v. Turkish*, 623 F.2d 769, 777 (2d Cir. 1980) ("[*Smith*] was simply an instance of a prosecutor interfering, for no apparent reason, to suppress evidence that was about to become available to the accused."). A proceeding "[t]hat casts the prosecutor in the role of an architect," instead of participant, does not "comport with standards of justice." *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

Other courts have not distinguished, as we did in *Smith*, the prosecution's interference with a witness from its refusal to immunize a witness. Instead, they have treated the Government's refusal to grant immunity as a question of misconduct. *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir. 1991) ("Prosecutorial overreaching may also involve deliberate denial of immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation."); *United States v. Angiulo*, 897 F.2d 1169, 1192 (1st Cir. 1990) ("[T]he government could intentionally distort the fact-finding process by deliberately withholding immunity from certain prospective defense witnesses for the purpose of keeping exculpatory evidence from the jury."); *Hooks*, 848 F.2d at 802 (considering whether "the government's withholding of immunity distorted the

29

fact-finding process by keeping exculpatory evidence from the jury"); *United States v. Frans*, 697 F.2d 188, 191 (7th Cir. 1983) (requiring a defendant to show "that the government intended to distort the judicial fact-finding process" by refusing to immunize a defense witness after immunizing a prosecution witness).

The five factors considered in *Smith* remain analytically helpful, as they capture those situations where the Government, for tactical reasons, has used its power to threaten prosecution and withhold immunity to keep exculpatory and essential testimony from trial for no strong countervailing reason. This test fleshes out, and thus complements, *Morrison*'s metric of deliberate distortion. For good reason this test also requires a more exacting showing than does the broader misconduct test. When a defendant alleges that the Government's refusal to immunize resulted in an unfair trial, he is challenging its statutory discretion in his case and possibly others. If the defendant can show, as a *prima facie* matter, a witness's testimony is available, clearly exculpatory, and essential—in effect showing that the prosecutor's actions have impaired the ability to present an effective defense—we will consider the due process concerns raised regarding the Government's discretion to grant or deny immunity. The five-factor test aids this inquiry for prosecutorial misconduct, and we continue its use.

## C.    The Remedy

Once *Smith*'s five-part test is understood as a gauge of prosecutorial misconduct, the remedy for such a finding follows easily. It is vacating the conviction and allowing a new trial where the Government can elect to exercise its

30

statutory authority to obtain a grant of immunity for the witness. *United States v. Pennell*, 737 F.2d 521, 526 (6th Cir. 1984) ("The recommended remedy in such cases has been that a court . . . set aside the conviction and remand the case to afford the prosecutor an opportunity to immunize . . . ."). If the Government refuses to immunize the witness in violation of the defendant's due process right, the trial court can dismiss the charges against the defendant.[3]

Courts sometimes refer to this remedy as "compelling the Government to immunize the witness," *id.* at 468, but that is imprecise. Dismissing the charges unless the witness is immunized leaves prosecutorial decisions in the hands of the Government. It may grant immunity to the witness and attempt to convict the defendant in a fair trial, or it may decide that denying the witness immunity is more important to its goals than seeking that conviction. But the remedy does not compel the Government to do anything. It simply prevents prosecutors from obtaining a conviction through a process that lacks the fairness afforded by due process. *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988) ("[T]he prosecutor's power to seek or to refuse to seek immunity is limited by the constitutional right to due process of the law.").

---

[3] While we do not deal in this opinion with a possible alternative to dismissal, we note the possibility in the rare case that another cure could correct the distortive effect. *See, e.g.*, *United States v. Moussaoui*, 382 F.3d 453, 476–77 (4th Cir. 2004) (appropriate substitute for witness's testimony made available, so dismissal of charges not necessary).

### D. Bad Faith

The Government argues that any test for a due process violation must require the defendant to show bad faith on the part of the Government. *See United States v. Santtini*, 963 F.2d 585, 596–97 (3d Cir. 1992) ("As a general matter, even when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith."). The element of bad faith, however, does not require a defendant to show specific intent on the part of the Government to interfere with his due process rights. *See Morrison*, 535 F.2d at 227 ("The good faith of the [prosecutor] would be relevant if *he* were charged with violation of 18 U.S.C. § 1503[,] which makes the intimidation of a federal witness a criminal offense. It is not, however, relevant to an inquiry into whether a *defendant* was denied his constitutional right." (emphases in original)).

Our concern is with the effect of the prosecutor's actions on the process afforded to the defendant. "The Due Process Clause addresses the defendant's right to a fair trial, not just whether the government intended to deny the defendant his rights." *United States v. Straub*, 538 F.3d 1147, 1160 (9th Cir. 2008). "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 110 (1976). Courts should protect against deliberate wrongdoing by prosecutors and, in those rare cases where it arises, overzealous advocacy that distorts the factfinding function of a criminal trial.

That said, prosecutorial misconduct is an area of the law requiring sensitivity. Courts should be hesitant, absent a strong showing by the defense, to determine that the Government has engaged in misconduct by exercising its prosecutorial discretion and withholding immunity from a witness.

\*     \*     \*     \*     \*

To summarize, judicial use immunity impinges on the separation of powers between the Executive and Judicial Branches of our Federal Government. The grant of witness immunity, reserved by statute to the Executive Branch, does not also reside with the Judiciary. We overturn that portion of our holding in *Smith* that recognizes the authority of courts to confer immunity on a witness. But we keep the test we created in that case, which we now recognize as supplementing our deliberate distortion test for prosecutorial misconduct. The appropriate remedy if a defendant can prove misconduct is to allow the Government to seek immunity for the witness at retrial or have the charges dismissed. With this revised legal framework, we turn to Quinn's challenge to his conviction.

## IV.    Quinn's Appeal

In the District Court, Quinn sought immunity for Johnson to testify, claiming that Johnson's testimony was necessary for him to present an effective defense. Denying that immunity, Quinn contends, is a due process violation requiring a new trial. "Ordinarily we review a denial of a motion for a new trial under an abuse of discretion standard." *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993); *cf.*

*United States v. Mike*, 655 F.3d 167, 173 (3d Cir. 2011) ("Ultimately, the question of whether clearly exculpatory evidence is necessary to present an effective defense is a decision calling upon the sound judgment of the district court judge in a position to listen to the witnesses and evaluate the tenor of trial narratives."). When the alleged violation includes "issues of law and fact[,] . . . we review the district court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard." *Joseph*, 996 F.2d at 39; *see United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).

On appeal, Quinn argues for the first time that the prosecution engaged in misconduct by interfering with Johnson's testimony. He alleges that the Government's motion to delay Johnson's sentencing until after Quinn's trial caused Johnson to invoke the Fifth Amendment and refuse to testify. Yet before trial Quinn expressly disclaimed an argument that the prosecution engaged in misconduct. At argument on his motion *in limine* to have Johnson immunized by the Court, Quinn's counsel agreed that the prosecutorial misconduct theory was not at issue because Quinn did not allege "the government [was] doing anything improper."

Because he raises this argument for the first time on appeal, we review for plain error. Fed. R. Crim. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 135 (2009). We follow the four-step inquiry set out in *United States v. Olano*, 507 U.S. 725, 732–36 (1993). "First, there must be an error or defect—some sort of deviation from a legal rule . . . ." *Puckett*, 556 U.S. at 135 (alteration and internal quotation marks omitted). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.*

"Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 734). Even when all three of these conditions are satisfied, there is a fourth step. "[W]e will exercise our discretion to correct the unpreserved error only if . . . a miscarriage of justice would otherwise result, that is, if the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Corso*, 549 F.3d 921, 929 (3d Cir. 2008) (internal quotation marks and alteration omitted).

## A. Refusal to Immunize Johnson's Testimony

We repeat for ease of reference that, to prove a due process violation on the basis of the Government's refusal to immunize a defense witness, the defendant must show the following five elements. "[1] [I]mmunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity." *Smith*, 615 F.2d at 972. The first two are not disputed. Quinn requested that Johnson be immunized and he was available to testify. We note, however, that there is no evidence that Quinn directed his immunity request to the Government. Going forward, defendants must seek immunity for their witnesses from the Government, not the district courts. In the unusual posture of this case—where we have kept the analytical test but no longer recognize a district court's ability to immunize a witness—we will assume, from the Government's opposition

35

to Quinn's motion *in limine*, that it would have refused to immunize Johnson if asked.

We start with the requirement that Quinn show that Johnson's testimony is clearly exculpatory, *i.e.*, that it would exonerate or free him of guilt or blame. Testimony that is "at best speculative," *United States v. Ammar*, 714 F.2d 238, 251 n.8 (3d Cir. 1983), "severely impeached" by the witness's prior inconsistent statement(s), *United States v. Perez*, 280 F.3d 318, 348 (3d Cir. 2002), ambiguous on its face, *Smith*, 615 F.2d at 972, or "even if believed, would not in itself exonerate [the defendant]," *United States v. Lowell*, 649 F.2d 950, 965 (3d Cir. 1981) (emphasis omitted), is not clearly exculpatory.

Quinn and *Amicus Curiae*, the National Association of Criminal Defense Lawyers, urge us to be less exacting in our requirement that evidence be clearly exculpatory. They argue that immunity should be available if the evidence is "materially favorable to the defense on the issue of guilt," Appellant's Supplemental Br. at 19, or "could contribute substantially to raising a reasonable doubt," Amicus Br. at 11. We continue to be guided (as was the *Smith* Court) by the Supreme Court's holding in *Chambers v. Mississippi*. It required the State of Mississippi to abrogate otherwise appropriate evidentiary rules when they prevented the defendant from presenting essential testimony. 410 U.S. 284 (1973); *see also Lowell*, 649 F.2d at 964 (noting *Smith's* reliance on *Chambers*). Although rules of evidence often exclude testimony that a defendant believes is materially favorable or would contribute to raising a reasonable doubt of guilt, the *Chambers* line of cases permits abandoning those rules when they "infringe upon a weighty interest of the

36

accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration and internal quotation marks omitted). A weighty interest exists when the Government's decision not to immunize the testimony of a defense witness blocks the defendant's ability to present a meaningful defense; that is, with the evidence he might disprove the Government's case, without it he cannot.

This case requires us to clarify two of our cases discussing the clearly exculpatory part of the *Smith* test. We have held that a witness's testimony "undercut" or "undermine[d]" by evidence presented by the Government was not clearly exculpatory. *United States v. Thomas*, 357 F.3d 357, 365–66 (3d Cir. 2004); *Mike*, 655 F.3d at 172. To avoid any misunderstanding as to those terms, we note that the obvious purpose of exculpatory evidence is to contradict the Government's evidence against the accused. It is hard to imagine a case in which a defendant's evidence of his innocence is not, in some respect, undermined by the Government's evidence of his guilt. The existence of conflicting evidence does not affect, however, whether the defense evidence is exculpatory, though it may affect its weight. Thus, though exculpatory on its own, defense evidence that is *overwhelmingly* undercut or undermined by substantial prosecution evidence in the record becomes so lacking in credibility that it cannot be *clearly* exculpatory.

In this case, Johnson's testimony is not clearly exculpatory. First, we do not know the contents of Johnson's testimony. Quinn offered no proof that Johnson would offer exculpatory testimony at all, let alone clearly exculpatory evidence. In any event, Johnson's putative testimony would

37

be overwhelmed by the evidence of Quinn's guilt presented by the Government.

Quinn points to Johnson's statement to police on the afternoon of the robbery that Quinn was not involved in the robbery. Even if Johnson testified consistently with that statement—a matter in doubt—its believability is undermined by his additional statement that he did not want to discuss the involvement of Quinn because the latter is the brother of Johnson's fiancée. Their familial connection provides Johnson with a reason to shield Quinn from suspicion and guilt. Johnson's credibility would be eroded in other ways as well. Johnson had already pled guilty to his role in the bank robbery, and thus would have been subject to the accusation that any exculpatory testimony was his effort to "take the fall" for a friend and codefendant. After his arrest, Johnson gave inconsistent statements to the police, first telling them that he walked to the shopping center where he met Quinn, then reporting that he was driven there by a friend. He also told police that he called Quinn from the shopping center parking lot, but call records presented at trial showed that no calls were made from Johnson's phone to Quinn. In addition, the Government would have attacked Johnson's credibility by presenting evidence of his prior convictions for theft and fraud.

Most important, Johnson's testimony would be overwhelmed by the Government's case against Quinn. He called Johnson numerous times on the morning of the robbery, and then deleted records of those calls before police obtained his phone. He hid his car out of sight of the bank while Johnson committed the robbery, and the robbery occurred close to Quinn's relative's house, where Quinn

drove immediately after Johnson obtained the money. Also, two of Quinn's cellmates presented direct evidence that (i) he boasted about planning and participating in the robbery and (ii) he hoped to get away with the crime by claiming that only Johnson was involved.

This is not an instance where the defense witness's testimony (even assuming it were given as Quinn hopes) would make suspect the Government's case. *See Smith*, 615 F.2d at 966–67. Considering these items of evidence together, we cannot conclude that Johnson's testimony was clearly exculpatory. Because Quinn has not made this showing, we do not need to consider whether Johnson's testimony was essential or whether the Government had a strong countervailing interest for refusing to grant Johnson immunity. (The latter avoids our scrutinizing the Government's prosecutorial decisions unless necessary to do so.)

## B.      Delay of Johnson's Sentencing Hearing

We next turn to Quinn's claim that the Government engaged in deliberate distortion of the factfinding process by delaying Johnson's sentencing hearing. As mentioned, we review for plain error. "If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed." *Puckett*, 556 U.S. at 134. We "correct only particularly egregious errors." *United States v. Young*, 470 U.S. 1, 15 (1985) (internal quotation marks omitted).

We start with whether there is error that is clear. The Government's motion to continue Johnson's sentencing is not

akin, in either quantity or quality, to the repeated and intimidating reminders of criminal exposure imposed on the witnesses in *Morrison* or *Webb*. Quinn has presented no evidence that Johnson intended to testify on Quinn's behalf but was dissuaded from that testimony by the Government's motion. Indeed, Johnson took no position on the delay of his sentencing, and informed the Court that he would invoke his Fifth Amendment privilege if called to testify, apparently without regard to the timing of his sentencing hearing.

In addition, Quinn typically must "have [his] witness available as he finds him." *United States v. Herman*, 589 F.2d 1191, 1199 (3d Cir. 1978). When he first sought Johnson's testimony, Johnson was awaiting sentencing. The Government's motion for continuance merely maintained that state of affairs after Quinn's successful motion to delay his trial. Johnson was available to Quinn exactly "as he [found] him" *id.*, prior to the delay of trial. We discern no distortion of the factfinding process, and thus no prosecutorial misconduct or error that is clear.

Quinn fares no better on the third and fourth steps of our plain error inquiry. He has not demonstrated that Johnson's testimony would have changed the outcome of his case or that the absence of this testimony affected the integrity, fairness, or public reputation of the judicial proceedings here. Even assuming that Johnson would have testified that Quinn was uninvolved (which, again, we do not know), we are not persuaded, for the reasons explained above, that it would have altered the jury's finding of guilt. Quinn had the opportunity to present a full defense against the Government charges, including (as he did) by taking the stand in his own defense. "The jury had before it all the facts

40

and claims appellant intended to elicit from the witnesses for whom he sought immunity." *United States v. Alessio*, 528 F.2d 1079, 1082 (9th Cir. 1976). We cannot say that Quinn's trial was unfair because it lacked Johnson's testimony.

Finally, Quinn also argues, for the first time in his Supplemental Brief filed for our rehearing *en banc*, that the District Court erred by finding that Johnson properly invoked his Fifth Amendment privilege without requiring that he take the stand and invoke the privilege as to specific questions. Because this issue was not raised in Quinn's notice of appeal or opening brief, it is waived. Fed. R. App. P. 28(a)(5); *United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008); *Kost v. Kozakiewicz*, 1 F.3d 176, 182 & n.3 (3d Cir. 1993). Even if it were not, Quinn acknowledges there is no plain error here, Appellant's Supplemental Br. at 23 n.16, as he does not challenge Johnson's right to claim the privilege.

## V.    Conclusion

The prosecutorial misconduct test from our pre-*Smith* cases—deliberate intent to distort the factfinding process—provides a due process guard against Government interference with a defense witness. The *Smith* five-part test aids in this analysis when the Government exercises its statutory authority not to immunize a witness for the defense.

Our holding today departs from *Smith*, however, by eliminating the grant of a judicially imposed remedy of use immunity to a defense witness. Courts lack that authority, as immunity is a statutory creation reserved to the Executive Branch. If the accused can show a due process violation, a trial court has the authority to vacate a conviction to allow a

41

new trial where the Government may immunize the witness's testimony or, if the Government won't immunize, to dismiss the charges.

Applying our revision to this case, Quinn fails to show that the Government interfered unconstitutionally with Johnson's decision not to testify. We thus affirm.