Filed 3/6/23  P. v. Robinson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>         Plaintiff and Respondent,<br><br>v.<br><br>MARIUS ROBINSON,<br><br>         Defendant and Appellant. | A163873<br><br>(Alameda County Super. Ct. No. 20CR011984) |

A jury convicted Marius Robinson of murder for shooting Robert C. on a street corner in Oakland in July 2020.  Robinson contends that the prosecution committed misconduct by refusing to grant use immunity to one of his witnesses and that the trial court erred by admitting video evidence of a shootout that occurred a few months before Robert C.'s murder.  We find no error and will affirm.

### BACKGROUND

**February 2020 shooting**

One day in February 2020, an SUV turned north onto 74th Avenue from International Boulevard and stopped for about a minute.  Robinson pulled up in his car and stopped behind the SUV.  The SUV then proceeded northbound on 74th Avenue.

1

About 25 seconds later, Robinson drove north on 74th Avenue very quickly.

Meanwhile, at the other end of the block, a pickup truck turned south onto 74th Avenue. A garbage truck in the middle of the street blocked traffic in both directions and separated the pickup truck from the SUV. Earl Anthony and Troy Fletcher got out of the pickup truck, carrying handguns. A surveillance camera video captured the pickup truck slowly driving towards the garbage truck while the men walked and then ran south on the sidewalks on both sides of 74th Avenue, shooting at the SUV when they approached the garbage truck. Anthony and Fletcher exchanged 10 to 15 shots with the occupants of the SUV. They then ran back north on 74th Avenue while continuing to fire at the SUV and turned the corner onto a different street. The pickup truck reversed away from the area of the shooting and around the corner where Anthony and Fletcher had run; the truck then picked up Anthony and Fletcher and drove off.

Two minutes after he had driven quickly north towards the area where the shootout took place, Robinson sped in reverse back south and pulled into the driveway of his home on 74th Avenue. Robinson then went in his house.

The driver of the pickup truck was an African-American man in his 40s. Police engaged in a high-speed pursuit of the pickup truck, but an air support unit lost sight of it. Police later apprehended Anthony and Fletcher but not the driver of the pickup truck, which the police found abandoned. However, the

2

police observed the vehicle and saw Keyniya Grier and another woman walk up to the pickup truck and drive off in it.

Robinson visited Fletcher and Anthony while the two were in jail. Grier also visited Fletcher, and she visited Robinson as well after he was later arrested. During one of Robinson's visits with Anthony, Anthony described seeing someone driving very quickly and hoping the driver did not get pulled over. Robinson responded, "I was, right?"

The police found 9-millimeter bullet casings in and around the SUV on 74th Avenue and .45 caliber casings on the street. Some of the .45 caliber casings were manufactured by Aguila and others were manufactured by another company.

**Robert C.'s murder**

On July 2, 2020, Robert C., who had been drinking, spoke to Robinson's wife, Q.R., and tried to grab her in front of A.N.'s grocery store in Oakland.[1] Q.R. became upset and said she was going to call her husband. Q.R. entered A.N.'s store, and A.N. stopped Robert C. and told him to go away.

Q.R.'s brother, J.P., lived across the street from Q.R. and Robinson's home. J.P. was sitting in his car next to his home when Q.R. walked up. Q.R. was crying and told J.P. that she had gotten in an argument at the store with a man who had done something that upset her. J.P. then got out of his car and started

---

[1] Out of respect for their privacy, we use initials or first name and last initial to refer to witnesses, the victim, and individuals not involved in any crime. (Cal. Rules of Court, rule 8.90(b)(4), (b)(10); Advisory Com. com., Cal. Rules of Court, rule 8.90.)

walking to the store with Q.R.  J.P. intended to confront the person at the store and beat him if he had done what Q.R. had said.

While J.P. and Q.R. were walking down the street towards the store, they saw Robinson walking up the street towards them. Q.R. was still crying hard and explained to Robinson what had happened at A.N.'s store.  Robinson was excited and shocked.  He continued walking past Q.R. and J.P. and entered the gate of the complex where he and Q.R. lived.  By the time Q.R. and J.P. reached the corner of International Boulevard near the store, Robinson had rejoined them.  He was clutching something in his waistband as he walked.  The trio then began looking for Robert C., with Robinson in the lead, Q.R. behind him, and J.P. at the rear.

About 5 or 10 minutes after the initial argument that set off the search, Robinson, Q.R., and J.P. were back at A.N.'s store, where Robinson asked A.N. the whereabouts of the man who had tried to hurt Q.R.  A.N. explained that the man had gone. Robinson then went to get his BMW, and he met Q.R. and J.P. at a different business.  With J.P. in the front passenger seat and Q.R. in the back seat, Robinson drove to various locations where they got out and looked for Robert C.  Failing to find him, they continued to drive around looking for him, with Robinson stopping twice to talk to people.

Eventually, after about 30 minutes of searching on foot and in the car, Q.R. noticed Robert C. near the corner of 72nd Avenue and International Boulevard.  Robinson made a U-turn on

4

International Boulevard and then parked in the middle of the street on 72nd Avenue, near the corner. J.P. got out of the car and was about three feet away from Robert C. when he heard Robinson ask Robert C. what he had done to Q.R. Then J.P. heard some shots to the side and behind him and saw Robinson shoot Robert C. with a chrome handgun. They both got back in the car and drove back to their homes.

Police officers found five Aguila-brand .45 caliber casings at the corner where Robert C. was shot. A search of Robinson's home found that his BMW was the only car covered in his driveway. The BMW was not covered in an earlier Google map photo. Police found three unfired Aguila-brand .45 caliber cartridges in Robinson's bedroom.

Expert analysis of the Aguila casings found at the February 2020 shooting and Robert C.'s murder showed that the gun that was used to kill Robert C. was also one of the guns used in the February 2020 shooting. Additionally, the casings found at the February 2020 shootout, the casings found at Robert C.'s murder, and the unfired cartridges found in Robinson's bedroom had all been cycled through a second firearm, different than the one that was used to shoot Robert C.

Robinson was charged with murder (Pen. Code, § 187) and possession of a firearm with a prior conviction (Pen. Code, § 29900), as well as various special allegations about firearm use, infliction of great bodily injury, and prior convictions.

5

**Patrick Nickerson testimony**

At trial, Robinson called Patrick Nickerson as a witness to testify that Nickerson had been standing across the street when Robert C. was shot and that Robinson was not the shooter.

When Robinson first called him, Nickerson invoked the Fifth Amendment when asked whether he was present at the shooting. In a reported chambers conference, prosecutor argued that Nickerson's invocation of the Fifth Amendment was proper because, among other reasons, the prosecutor intended to cross-examine Nickerson about his involvement in other crimes, including separate incidents of armed robbery and a pending charge of being a felon in possession of a firearm. The trial court agreed.

Robinson argued that due process obligated the prosecutor to grant Nickerson use immunity for his testimony, since Nickerson was an eyewitness who could support Robinson's defense that he was not the shooter. Robinson said it was in the government's interest to grant Nickerson use immunity because it would allow the prosecutor to conduct exploratory questioning on his pending cases and allow for collateral investigation of any information learned. The prosecutor countered that Nickerson's testimony was not credible for various reasons and that use immunity was not in the government's interest because the government could not make use of any inculpatory admissions Nickerson might make. The court denied Robinson's request without prejudice to Robinson raising the issue again.

6

In open court, still outside the presence of the jury, the court nonetheless allowed Robinson to ask Nickerson more questions. Nickerson admitted telling the police in an interview that he saw a single light-skinned person who was probably taller than 6 feet 4 inches get out of the BMW and shoot someone. Robinson is not light-skinned. The court then held a recess so Nickerson could consult with counsel about invoking the Fifth Amendment. Nickerson's counsel alluded to Nickerson having cognitive issues that were causing him not to continue invoking the Fifth Amendment. The trial court decided to give Nickerson's counsel more time to consult with Nickerson before Nickerson testified before the jury.

Several days later, Nickerson returned to the stand, still outside the presence of the jury. After invoking the Fifth Amendment in response to several of Robinson's questions, Nickerson proceeded to testify that Robinson had not shot Robert C., he had not seen Robinson get out of the car, and he had not seen Robinson in the car at all. When the prosecutor attempted to cross-examine Nickerson by asking him about lies he had admitted telling the police in his interview about his involvement in an unrelated armed robbery, Nickerson invoked the Fifth Amendment or claimed not to remember. The court then brought in the jury, but Nickerson invoked the Fifth Amendment in response to every question and refused to testify at all. The trial court sustained Nickerson's invocation of the Fifth Amendment and ordered the jury not to consider his invocation for any purpose.

The prosecutor later stated for the record his reasons for not granting Nickerson use immunity. He said that Nickerson's testimony was not clearly exculpatory for various reasons, including his criminal history, his lies to the police, and the contradictions between his testimony, his prior statements to the police, and other available evidence. The prosecutor also asserted that the government had an interest in not granting use immunity to Nickerson because of the serious crimes in which he was believed to be involved (including one in which the suspects shot at two district attorney investigators), and the government's desire not to be prevented from using any statements he might make. The trial court agreed with the prosecutor that Nickerson's testimony was not clearly exculpatory.

Robinson later asked the trial court to read to the jury the testimony Nickerson gave outside the jury's presence, arguing it was admissible hearsay under Evidence Code section 1350.[2] The court denied the request.

**Robinson's defense**

Besides attempting to call Nickerson, Robinson attempted to show J.P. was the shooter by getting J.P. to admit that in his police interview he had initially denied being present during the shooting. J.P. had not told the police that he was at the shooting until the police falsely told J.P. that Robinson had said J.P. committed the crime and that J.P. could be charged with the murder if he did not name Robinson as the shooter. J.P.

---

[2] Undesignated statutory references are to the Evidence Code.

admitted that he interpreted the police as offering him immunity if he said what the police wanted.

Robinson called an expert who testified that bullet strike marks on the wall behind where Robert C. was shot were made from shots fired perpendicularly to the wall, not at an angle. In closing argument, Robinson relied on this, combined with J.P.'s testimony that he was standing in front of Robert C. and that Robinson was to J.P.'s side, to argue that J.P. must have been the shooter, not Robinson.

Robinson himself testified and denied shooting Robert C. Robinson denied ever learning why Q.R. was upset beyond that there had been some kind of argument. Robinson claimed he accompanied Q.R. and J.P. because he was concerned and wanted to figure out what was going on. Robinson said he was holding the waistband or pocket of his pants because they were too big, and claimed the bulge visible in surveillance camera footage was the flap of his belt. However, he admitted that other videos showed his belt flap on the opposite side of his body from where he was holding his waistband. He then shifted to saying the bulge was his belt buckle.

Robinson said he drove his BMW around with J.P. and Q.R. to look for a friend named Black who had been with Robert C. during the argument with Q.R., not to look for Robert C. Robinson said that Q.R. never recognized Robert C. on the corner of 72nd Avenue. Robinson only turned onto 72nd Avenue from International Boulevard because he saw Black. He insisted he never saw Robert C.

9

When Robinson stopped on 72nd Avenue, he said he rolled down his window to talk to Black, while J.P. got out and walked around the rear of the car. Robinson saw three flashes in his left side-mirror but did not hear anything. J.P. jumped back in the car and they drove away, with Robinson asking J.P. what happened and J.P. not answering. Robinson claimed he did not learn until later that someone had been shot on the corner, after he saw an alert from a neighborhood app on his phone. Robinson said he did not know that the .45 caliber cartridges were in his bedroom.

Concerning the February 2020 shooting, Robinson said he drove up the street towards the shooting but was stopped by a car in front of him making a three-point turn because of the garbage truck obstructing the street. When Robinson heard gunfire, he sped backwards in reverse rather than turning around to get away from the danger.

On cross-examination, Robinson claimed that he had been lying when he told the police in his interview that Q.R. had described Robert C. to him and explained what Robert C. had done, and that Robinson, Q.R., and J.P. had gone looking for Robert C. with J.P. leading the way. Robinson also said he lied to the police about many other details, such as his assertion in his interview that he never found Black or drove to 72nd Avenue in his BMW on the day of Robert C.'s shooting. He also admitted he lied when he told the police he did not know who shot Robert C.

Robinson admitted that he was friends with Fletcher, Anthony, and Grier. Robinson denied telling Fletcher during a

10

jail call after Robinson's arrest that it was important for things to "coincide" and said he actually told Fletcher it was important to "go inside." He admitted that he had told Fletcher to keep Q.R. "off the grid" and had agreed with Fletcher that he did not want her to "get grabbed." He also said he told Q.R. and his friends various lies, some of which were the same lies he told the police. The prosecution later argued these conversations were an attempt to make sure Q.R. and J.P. would tell the police the same story. Robinson admitted he had been convicted twice of credit card fraud and had a couple of other felony convictions.

**Jury verdict and sentence**

The jury found Robinson guilty of second-degree murder and possession of a firearm with a prior conviction and found true several special allegations. The trial court sentenced Robinson to prison for 60 years to life.

## DISCUSSION

### I. Denial of use immunity

Robinson's first argument concerns his inability to secure favorable testimony from Nickerson because the prosecutor did not grant Nickerson use immunity for his testimony.

The United States and California Constitutions protect defendants in criminal proceedings against compelled self-incrimination and also "privilege[] a person not to answer official questions in any other proceeding, 'civil or criminal, formal or informal,' where he or she reasonably believes the answers might incriminate him or her in a criminal case. [Citations.] One cannot be forced to choose between forfeiting the privilege, on the

11

one hand, or asserting it and suffering a penalty for doing so on the other." (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 714.)  It is nonetheless possible to compel a witness to give incriminating answers if the witness "receives immunity 'coextensive with the scope of the privilege'—i.e., immunity against both direct and 'derivative' criminal use of the statements.  [Citations.]  In such cases, refusals to answer are unjustified, 'for the grant of immunity has removed the dangers against which the privilege protects.' " (*Id.* at pp. 714–715.)

" '[A]lthough the prosecution has a statutory right, incident to its charging authority, to grant immunity and thereby compel testimony [citation], California cases have uniformly rejected claims that a criminal defendant has the same power to compel testimony by forcing the prosecution to grant immunity.' " (*People v. Samuels* (2005) 36 Cal.4th 96, 127.)  " 'The grant of immunity is an executive function, and prosecutors are not under a general obligation to provide immunity to witnesses in order to assist a defendant.' " (*People v. Williams* (2008) 43 Cal.4th 584, 622.)  Additionally, "California courts have no authority to confer use immunity on witnesses." (*People v. Masters* (2016) 62 Cal.4th 1019, 1051 (*Masters*).)

There remains one possible "theory by which due process may compel a defense witness to be immunized: If a defendant can show that the prosecutor refused to grant immunity ' "with the deliberate intention of distorting the judicial factfinding process," ' a retrial is necessary." (*Masters*, *supra*, 62 Cal.4th at p. 1051.)  According to this theory, "[w]hen the prosecutor is

12

found to have committed misconduct by withholding immunity, the remedy is to set aside the conviction and permit a new trial, at which the prosecutor can be ordered 'to grant statutory use immunity,' so that the witness can testify, or else face 'a judgment of acquittal.' " (*Ibid.*)

This theory arose from decisions from the federal Third Circuit Court of Appeals, most recently from *United States v. Quinn* (3d Cir. 2013) 728 F.3d 243 (en banc) (*Quinn*). (*Masters*, *supra*, 62 Cal.4th at pp. 1051–1052.) *Quinn* adopted a five-element test a defendant must satisfy to prove a due process violation from the prosecution's refusal to immunize a witness: " '[1] [I]mmunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity.' " (*Quinn*, at pp. 261–262; see also *Masters*, at pp. 1051–1052.)

In California, however, the general standard for prosecutorial misconduct is that " '[w]hen a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*Masters*, *supra*, 62 Cal.4th at p. 1052.) Prosecutorial misconduct is

13

reviewed for abuse of discretion.  (*People v. Dworak* (2021) 11 Cal.5th 881, 910.)

Robinson contends *Masters* endorsed the use of the *Quinn* elements and that those elements here lead to the conclusion that the prosecutor should have granted Nickerson immunity. Robinson's premise is incorrect, as *Masters* did not outright hold that the *Quinn* elements for evaluating misconduct claims arising from the denial of witness immunity control over the more general standard for prosecutorial misconduct.  (*Masters*, *supra*, 62 Cal.4th at p. 1052.)  Rather, the Supreme Court accepted for the sake of argument that the elements stated the correct test and then found that the defendant had still failed to satisfy them. (*Ibid.*)  Following *Masters*' lead, we, too, will accept for the sake of argument that *Quinn*'s elements provide the relevant framework, because Robinson's claim nonetheless fails under those elements. We need not consider all of the elements, however, as we conclude Robinson has failed to show that Nickerson's testimony was clearly exculpatory, which is sufficient to defeat his argument.

*Quinn* and *Masters* both elaborated on the meaning of "clearly exculpatory."  *Quinn* declared, "Testimony that is 'at best speculative,' [citation], 'severely impeached' by the witness's prior inconsistent statement(s), [citation], ambiguous on its face, [citation], or 'even if believed, would not in itself exonerate [the defendant],' [citation], is not clearly exculpatory."  (*Quinn*, *supra*, 728 F.3d at p. 262.)  *Quinn* distinguished between testimony that is exculpatory and testimony that is clearly exculpatory.  (*Id.* at

14

pp. 262–263.) The court recognized that "the obvious purpose of exculpatory evidence is to contradict the Government's evidence against the accused," so the existence of conflicting evidence does not affect whether a witness's testimony is exculpatory. (*Id.* at p. 263.) However, conflicting evidence does bear on the weight of the witness's testimony, so that, "though exculpatory on its own, defense evidence that is *overwhelmingly* undercut or undermined by substantial prosecution evidence in the record becomes so lacking in credibility that it cannot be *clearly* exculpatory." (*Ibid.*)

*Quinn* found the proposed witness's testimony at issue in that case was not clearly exculpatory because the defendant had not offered any proof that the testimony of the witness, who had already been convicted based on his role in the crime at issue, would be exculpatory, let alone clearly exculpatory. (*Quinn, supra*, 728 F.3d at p. 263.) *Quinn* also noted that the witness was possibly biased because the defendant was the brother of the witness's fiancée, the witness had already been convicted and could have been viewed as trying to " 'take the fall' " for the defendant, the witness had given inconsistent and inaccurate statements to the police about the details of the crime, and the witness would have been impeached with his prior convictions for theft and fraud. (*Ibid.*) Finally, and most importantly in the court's view, the witness's predicted testimony would have been overwhelmed by the prosecution's evidence of guilt. (*Ibid.*)

*Masters* reached a similar result. The defendant wanted to compel testimony from a witness who had confessed to

participating in a conspiracy to kill a correctional officer and named several other conspirators but did not name the defendant. (*Masters*, *supra*, 62 Cal.4th at pp. 1045, 1052.) *Masters* reasoned that the witness's testimony was not clearly exculpatory because there was no indication that the list of conspirators the witness gave was intended to be exhaustive. (*Id.* at p. 1052.) *Masters* also noted that other evidence established the defendant's guilt, including a note in the defendant's handwriting admitting his involvement. (*Id.* at p. 1053.) The Court therefore concluded that "the evidence of [the defendant's] involvement overwhelm[ed] any inferences that might have been drawn from [the witness] not naming [the defendant] as a conspirator." (*Ibid.*)

Nickerson's testimony here was likely to be favorable to Robinson, based on his testimony outside the presence of the jury that the prosecutors had "the wrong man," Robinson was not the person who shot Robert C., and he had not seen Robinson get out of the car or in the car at all. However, Nickerson's testimony still did not rise to the level of being "clearly exculpatory" as defined in *Quinn* and *Masters* because he was subject to impeachment, his statements about the crime were riddled with inconsistencies, and the prosecution's case was strong.

Beginning with impeachment, Nickerson could have been impeached with his charge of being a felon in possession of an assault rifle, which Robinson's counsel agreed was a crime of moral turpitude. (See *People v. Robinson* (2011) 199 Cal.App.4th 707, 715 [crime of possession of a firearm by a felon is crime of

16

moral turpitude]; see also *People v. Lepolo* (1997) 55 Cal.App.4th 85, 89 [witness can be impeached with conduct that has not resulted in a conviction].)  Nickerson also lied to the police in his interview about offenses for which he was arrested.  Nickerson initially denied recently seeing the principal perpetrator of two armed robberies or recognizing the perpetrator's car, but later in the interview he admitted that recent pictures from surveillance cameras showed him driving with the perpetrator in the perpetrator's car.  Robinson claims it borders on the absurd to find testimony of a repeat offender like Nickerson not clearly exculpatory simply because he did not confess to his own crimes.  But the issue is not whether or not Nickerson confessed; it is whether he lied to the police concerning his offenses when he could have simply remained silent.  We have little trouble finding that Nickerson's self-serving lies significantly undermine his credibility.

This impeachment would have been significant when combined with evidence of the numerous inconsistencies in Nickerson's statements about Robert C.'s murder.  Nickerson's police interview statements and testimony about witnessing Robert C.'s shooting contradicted his prior statement to two police officers on the day of the crime that he had no information about the shooting.  Nickerson claimed in his police interview that his initial statement to police was a lie.

Additionally, Nickerson testified in court that the shooter was probably taller than 6 feet 4 inches tall and "tall for sure," and he had told the police variously the shooter "had height on

17

him" and "wasn't no short person." But Nickerson also testified he was not sure how tall the shooter was, and he told the police the shooter "was not too tall," and was "kind of tall or lanky." Nickerson initially said in his police interview that Robinson's BMW was white, and he shifted to saying the car was black only after seeing a picture of the car. At certain points in his police interview, Nickerson said confidently that the shooter came out of the driver's side of the BMW, wore a white shirt, and was the only person to exit the car. But he also said he was not sure whether the shooter got out of the driver's or passenger's side. In his trial testimony, Nickerson said that the shooter came out of the BMW, but claimed he did not remember which side.

Robinson argues that Nickerson's varying statements indicate simply that he did not remember clearly. He points out that some of the details Nickerson provided the police about the shooting were accurate, such as that Robert C. ran away after being shot and collapsed in the middle of the street, or that the BMW took a sharp turn before stopping on 72nd Avenue. Robinson also contends that Nickerson provided the police a great deal of accurate information about other crimes. But none of this helps Robinson, as Nickerson's inconsistencies about the key details of Robert C.'s shooting made his likely testimony less persuasive, regardless of whether the inconsistencies were genuine failures of memory or the result of something else. Moreover, it is noteworthy that Nickerson was certain about details, such as Robert C.'s reaction, that would not inculpate anyone. He professed uncertainty only about core facts—like the

18

shooter's description, the color of the BMW, or whether the shooter was the driver or passenger in the car—which could be used to determine who was the killer. Nickerson's hedging on the more important details substantially undermined the value of his testimony, preventing it from being of much help to Robinson.

Nickerson's statements to the police were also contrary to other available evidence and the key theory of Robinson's defense, to which Robinson testified directly, that J.P. shot Robert C. Nickerson told the police that the shooter was most likely wearing glasses. J.P. testified that he needed glasses but was not wearing any and did not own any at the time of the shooting, and neither J.P. nor Robinson were wearing glasses in the surveillance videos. When looking at a photo line-up, Nickerson picked two individuals who were not Robinson or J.P. Nickerson was certain that the shooter was light-skinned, which did not match either Robinson's or J.P.'s appearance. Nickerson's various statements about the shooter being tall but not too tall were also inconsistent with J.P. being the shooter, since J.P. was 6 feet 6 or 7 inches tall, which is quite tall by any metric.

Nickerson's inability to pick J.P. out of the photo lineup is not concerning, according to Robinson, because the transcript shows Nickerson was reluctant to identify the shooter out of fear that the shooter would retaliate against him. But this explanation does not bolster Nickerson's credibility, as Robinson

provides no explanation why Nickerson would feel safer identifying the shooter in open court than he did in the lineup.[3]

Beyond not being very helpful to Robinson, some aspects of Nickerson's testimony actually could have helped the prosecution. Nickerson's testimony outside the presence of the jury that he did not see Robinson in the car at all was contrary to video evidence and Robinson's own testimony in which he admitted that he drove the BMW. Nickerson's statements to the police that the shooter came out of the driver's side and was wearing a white shirt strongly supported the prosecution's case, since video evidence showed that Robinson was the driver and was wearing a white shirt. Additionally, Robinson himself was 5 feet 11 inches tall, which is consistent with Nickerson's description of the shooter as "kind of" tall and definitely not short.

Moreover, other evidence of Robinson's guilt was overwhelming and undermined the value of any support Nickerson might have offered to Robinson's defense—in

---

[3] The prosecutor offered additional rationales in the trial court for why Nickerson's testimony was not clearly exculpatory, such as the prosecutor's belief that Nickerson was not testifying from personal knowledge and had answered questions initially only to invoke the Fifth Amendment in front of the jury as a ploy to assist Robinson, whom the prosecutor asserted was a gang member like Nickerson. The prosecutor further detailed additional inconsistencies within Nickerson's statement to the police and between that statement and other available evidence. We need not discuss these additional rationales because the impeachment and inconsistencies that we discuss in the text are sufficient to show that Nickerson's testimony was not clearly exculpatory.

particular because the inculpatory evidence consisted of testimony from a disinterested third party, video footage, and ballistics evidence. A.N., the store owner, testified that Robinson came into the store looking for the man who hurt his wife. This contradicted Robinson's testimony that he never learned fully what Robert C. had done to Q.R. Video evidence showed Robinson was agitated and leading Q.R. and J.P. while they searched for Robert C., which supported the theory that Robinson was the shooter and was inconsistent with Robinson's statement to the police that J.P. led the search. Surveillance video showed Robinson holding a bulge under his shirt against his hip while looking for Robert C., which was likely a gun he retrieved from his house after initially encountering Q.R. and J.P. Robinson's claim that the bulge was his belt buckle or the tail of his belt and that he was holding it to hold up his pants was not credible since videos demonstrated the belt tail was dangling to the opposite side from the center of his body, suggesting the belt buckle was also in the center of his body. Additionally, Robinson was not pulling up his pants in any of the videos, even when jumping up and down or running.

Perhaps most significantly, the gun used to kill Robert C. was the same one that Robinson's admitted friends fired in the February 2020 shooting at which Robinson was present; ammunition of the same type used to kill Robert C. was found in Robinson's bedroom; and the ammunition from the February 2020 shooting, Robert C.'s shooting, and Robinson's bedroom had all been cycled through another gun. Robinson never even tried

21

to explain how the ammunition connected to the two crimes came to be in his bedroom, instead simply claiming ignorance. In addition, Robinson's choice to cover the BMW in his driveway but not any of his other cars, as well as various statements he made during jails calls or visits about coordinating stories and preventing the police from speaking to Q.R., suggested consciousness of guilt.

Taking all this together, Nickerson and his likely testimony was " 'severely impeached,' " inconsistent, and "overwhelmingly undercut or undermined by substantial prosecution evidence in the record" to the point that it became "so lacking in credibility that it cannot be clearly exculpatory." (*Quinn, supra,* 728 F.3d at pp. 262–263, italics omitted.)

Robinson raises several legal arguments against the significance of these problems with Nickerson's testimony. He contends none of these issues prevent Nickerson's testimony from being clearly exculpatory, citing *Quinn*'s statement that "[t]he existence of conflicting evidence does not affect, however, whether the defense evidence is exculpatory, though it may affect its weight." (*Quinn, supra,* 728 F.3d at p. 263.) Relatedly, Robinson argues that any inconsistencies in Nickerson's testimony do not mean his testimony was not clearly exculpatory because a jury can believe testimony despite inconsistencies.

Robinson misreads *Quinn* and misconstrues the nature of the "clearly exculpatory" inquiry. Nickerson's testimony could be exculpatory despite its flaws. But Robinson must prove not just that the jury could credit Nickerson's testimony and that it was

exculpatory, but that Nickerson's testimony was *clearly* exculpatory evidence that would render the prosecution's case suspect. As discussed *ante*, *Quinn* recognized that while inconsistencies, conflicting evidence, and impeachment of a witness cannot prevent a witness's testimony from being exculpatory, such flaws can prevent testimony from being clearly exculpatory. (*Quinn, supra*, 728 F.3d at p. 263; see also *United States v. Baca* (D.N.M. 2020) 447 F.Supp.3d 1149, 1227 ["The word "clearly" heightens the defendant's burden"].) Failing to recognize that the *Quinn* standard is contextual, Robinson presents Nickerson's testimony in isolation and thereby ignores the extent to which it is undercut by the significant and objective evidence of Robinson's guilt. In the context of the full record, Nickerson's testimony was not clearly exculpatory. It was, at best, unreliable and implausible, and at worst, potentially part of an effort to mislead.

## II.  Admission of video of February 2020 shooting

Robinson next argues that the trial court erred by allowing the prosecutor to play video evidence of the February 2020 shooting. Robinson does not dispute that some evidence related to the shooting–such as the ballistics comparisons as well as evidence about Anthony's and Fletcher's involvement with the shooting and affiliation with Robinson–was relevant to prove a connection between him and the gun used to shoot Robert C. He disputes only the use of the video of Anthony and Fletcher engaged in the shootout. Robinson contends the video was inadmissible under section 352 and its admission violated his

23

right to due process. Robinson also argues briefly that the video was improper character evidence under section 1101, subdivision (a).

Preliminarily, the People contend Robinson forfeited these challenges to the video by failing to object on these grounds to the video in the trial court. A party cannot argue on appeal that evidence was improperly admitted unless he or she objected to the specific evidence on the same basis in the trial court, because "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Holford* (2012) 203 Cal.App.4th 155, 169, italics omitted.)

The parties discussed sections 352 and 1101 in connection with the prosecution's motion in limine to admit evidence of the February 2020 shooting and Robinson's motion to exclude all evidence of his prior misconduct. The trial court ruled that evidence of the February 2020 shooting was admissible under section 1101, subdivision (b), as circumstantial evidence of Robinson's access to the same firearm used to kill Robert C. When the parties discussed the video evidence specifically during trial, Robinson again raised section 352 as a basis for excluding the video, albeit without substantive argument. The trial court analyzed the video under section 352 and ruled it was admissible. Because the trial court conducted the analyses that Robinson now argues were error, the purpose of the forfeiture rule was fulfilled and Robinson preserved his arguments under sections 352 and 1101.

As for Robinson's constitutional argument, Robinson essentially argues that the trial court's error in admitting the video under section 352 "had the additional legal consequence of violating the Constitution." (*Masters, supra*, 62 Cal.4th at p. 1041, italics omitted.)  As a result, Robinson has not forfeited the argument.  (*Ibid.*)  However, our rejection of Robinson's argument under section 352 "necessarily leads to rejection of the newly applied constitutional 'gloss' as well," so we need not discuss due process principles.  (*Ibid.*)

"Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time.  'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' "  (*People v. Riggs* (2008) 44 Cal.4th 248, 290.)  "In applying this statute we evaluate the 'risk of "*undue*" prejudice, that is, " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,' " not the prejudice "that naturally flows from relevant, highly probative evidence." ' "  (*People v. Salcido* (2008) 44 Cal.4th 93, 148.)  We review for abuse of discretion a trial court's admission of evidence, meaning we consider whether the trial court's exercise of discretion was arbitrary, capricious, or patently absurd.  (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

Robinson contends that the video of Anthony and Fletcher engaged in the shootout was highly prejudicial because it showed a running gun battle on a residential street and suggested Robinson was involved in gang activity.  He argues the video had no probative value that could outweigh this prejudice because the video did nothing to tie Robinson to the firearms.  The only evidence necessary for that, according to Robinson, was the testimony of a police officer who witnessed Anthony and Fletcher take part in the shooting; the ballistics evidence regarding the ammunition found in Robinson's bedroom, the ammunition fired in the February 2020 shooting, and the ammunition fired at Robert C.; and evidence of Robinson's association with Anthony and Fletcher.  The trial court disagreed, ruling that it was "a fairly easy call" that the video was admissible.  It found the evidence probative because it showed the shooting and corroborated the police officer's description of it, and the trial court found no factors supporting exclusion, such as undue prejudice.

The trial court did not abuse its discretion.  The ballistics evidence, police officer testimony, and evidence of Robinson's association with Anthony and Fletcher, without more, might have been minimally sufficient to tie Robinson to the gun that killed Robert C.  But the trial court was correct that the video evidence corroborated the police officer's testimony in all relevant respects, and the trial court could reasonably allow the prosecution to offer this corroboration.  (*People v. Watson* (2008) 43 Cal.4th 652, 684 [evidence of issues not in dispute and repetitive evidence can be

admissible under § 352]; *People v. Thomas*, *supra*, 53 Cal.4th at p. 806 ["Photographs and other graphic evidence are not rendered 'irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate' "].)

Moreover, the video is highly probative, establishing Robinson's direct involvement in the shootout in which his admitted friends used the gun that killed Robert C. Combined with the other videos of Robinson's BMW driving up behind the target of the shooting, speeding towards the scene, lingering for two minutes, and then speeding away from the shootout, the shootout video supports the inference that Robinson was involved somehow in the shooting and therefore knew of Anthony's and Fletcher's involvement as well. This in turn buttresses the connection between Robinson and the gun that killed Robert C. by making it more difficult for Robinson to claim ignorance about Anthony's or Fletcher's possession and use of the gun.[4]

On the prejudice side of the scale, the shootout video was not long, running about one and a half minutes long. The

---

[4] The prosecutor contends the video of the shootout, in combination with other testimony, would help show that Robinson was the driver of the pickup truck who carried the shooters away from the scene and then engaged in a high-speed chase with the police. This alternative theory is less plausible for various reasons, but whatever its merit, the shootout video does not support it. The shootout video does not show Robinson driving the pickup truck, so the only connection between Robinson, the pickup truck, and the high-speed chase would come from the testimony about the chase and the later recording of Anthony and Robinson discussing Robinson driving fast.

prosecutor played a second video, but it was just a ten-second zoomed-in clip from the first. The video of a daytime shooting on a residential street demonstrating a callous disregard for innocent bystanders' lives could pose some risk of leading the jury to form an emotional bias against Robinson. But the trial court did not abuse its discretion in concluding that any such prejudice was slight in comparison to the video's probative force on a highly relevant issue—Robinson's connection to the murder weapon. Indeed, most of the prejudice from the video was the sort "that naturally flows from relevant, highly probative evidence" ' " connecting Robinson to the gun. (*People v. Salcido*, *supra*, 44 Cal.4th at p. 148.) The trial court's balancing of the risk of undue prejudice from these short videos against their probative value and admission of the videos was not arbitrary, capricious, or absurd.

Robinson's gang-related arguments do not persuade us otherwise. Neither the police nor the prosecutor mentioned the possibility of gang involvement. In any event, the more sanitized form of the evidence that Robinson concedes was relevant— testimony that Anthony and Fletcher, who were Robinson's admitted friends, got out of a vehicle driven by a third person, engaged in a daytime shootout of 10 to 15 shots with the occupants of another vehicle, and then sped away—would raise the same suspicions of gang-related activity as the video. The video was more compelling, but the risk of it raising Robinson's affiliation with gangs in the minds of the jurors was not

28

substantially greater than that raised by the concededly relevant non-video evidence.

Finally, in a variation on his argument under section 352, Robinson contends under section 1101 that the video evidence had no probative value on any issue in dispute and so could only have been improper character evidence to prove his predisposition or propensity to kill Richard C.  Section 1101 "declares that 'evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.' (Evid. Code, § 1101, subd. (a).)  But '[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act.' (Evid. Code, § 1101, subd. (b); see also *People v. Catlin* [(2001)] 26 Cal.4th [81,] 145–146.)  We review for abuse of discretion a trial court's ruling under section 1101." (*People v. Rogers* (2006) 39 Cal.4th 826, 862.)

As we have already explained, *ante*, the video evidence had significant probative value because it corroborated the police officer's description of the shooting and connected Robinson to the gun that killed Robert C., and the court therefore did not err in finding it admissible under section 1101, subdivision (b).  The video of the February 2020 shootout was also no more

29

inflammatory than the evidence of the charged crime, including the videos of Robinson clutching at a weapon at his waist while engaged in a determined manhunt for Robert C., on foot and by car. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [evidence of defendant's uncharged acts had less potential for prejudice under § 352 where testimony describing them was no stronger and no more inflammatory than testimony regarding charged offenses].) It is therefore unlikely the jury convicted Robinson because of what the February 2020 video evidence might have suggested about his character rather than the strength of the evidence against him. (See *ibid.*)

## DISPOSITION

The judgment is affirmed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.*
STREETER, J.

*People v. Robinson* (A163873)

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.