Filed 2/27/24  P. v. Edwards CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM MELVIN EDWARDS, Jr.,<br><br>        Defendant and Appellant. | A163457<br><br>(Contra Costa County<br>Super. Ct. No. 05-191553-7) |

Early in the morning of June 1, 2018, Taison Calderon-Lopez was shot several times and killed outside his home in North Richmond.  Defendant William Melvin Edwards, Jr., was tried and convicted of conspiracy to commit Calderon-Lopez's murder, first-degree murder with the special circumstances that the murder was committed by lying in wait and for the benefit of a criminal street gang, and being a felon in possession of a firearm, along with various firearm and gang-related enhancements.

Edwards appeals, an appeal that has five arguments:  (1) the prosecutor committed misconduct by not granting immunity to a defense witness; (2) the trial court erred by holding an ex parte hearing for the prosecutor to discuss his reasons for declining to grant such immunity; (3) a prosecution expert testified to case-specific hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); (4) cumulative error; and

1

(5) changes made to the law by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), which became effective during the pendency of this appeal, requires the reversal of the gang-related special circumstance and enhancements. We agree that reversal of the gang-related special circumstance and enhancements is required, but otherwise affirm.

## BACKGROUND[1]

### The Shooting

On June 1, 2018, at 6:29 a.m., Contra Costa Officer Javier Rios responded to a dispatch regarding a shooting at the southwest corner of Grove Avenue and Giaramita Street in North Richmond. When he arrived, Officer Rios found a white truck with the driver's side door window broken. Inside the truck was a male, later identified as Taison Calderon-Lopez, who had suffered six gunshot wounds, was unresponsive, and was gasping for air. Calderon-Lopez later died of his injuries.

### The Investigation

Six 9-millimeter shell casings were found around the driver's door of the truck. A firearms expert later determined that all six casings were fired from the same gun.

Surveillance video was collected from various locations in the neighborhood of the shooting. Beginning on June 1, 2018, at about 5:32 a.m., one video showed a man walking along the sidewalk on the east side of Giaramita Street, turning right onto Grove, walking until he reached the property line at 548 Grove, and then turning around and walking westbound on Grove out of sight. Three minutes later, in a second video, a black Jeep SUV drove northbound on Giaramita Street, pulled to the east shoulder just

---

[1] We provide this factual background only as necessary to decide the issues on appeal.

2

north of Grove, and remained there until after the first 911 call, about 55 minutes later.  At about 6:24 a.m., the video showed a person getting out of the Jeep, walking across the street, committing the crime, and then running back to the Jeep.

On the morning of June 7, 2018, a black Jeep that had been reported stolen and matching the description from the videos was located at 1817 Giaramita Street and towed to the evidence center at the Contra Costa County Sheriff's Office.  A credit card application in Edwards's name with the address 239 South 5th Street in Richmond was located inside the Jeep, as well as a receipt from a McDonald's at 302 Potrero Avenue, San Francisco, dated June 2, 2018, at 2:43 p.m.  Surveillance videos from the McDonald's showed Edwards driving the Jeep through the drive-through.  The McDonald's store manager provided the credit card number used for the transaction, which corresponded to a Wells Fargo account associated with Edwards.  Fingerprints belonging to Edwards were also identified on the Jeep's driver's side door.

The Jeep's "Infotainment" system module was also removed, and its data extracted and analyzed, including odometer readings and information about devices that had connected to the Infotainment system.  On June 1, 2018, the Jeep's odometer reading increased by 0.62 miles between 5:27 and 5:29 a.m., increased by 0.62 miles between 6:25 and 6:29 a.m., and increased by 3.73 miles between 6:37 and 6:46 a.m., with no other increases from 2:53 a.m. until 6:46 a.m.  On June 2, 2018, from 1:28 to 2:30 p.m., the Jeep's odometer reading increased by 18.02 miles, approximately the distance between 509 Market Street in Richmond and 302 Potrero Avenue in San Francisco.

3

**The Proceedings Below**

On March 15, 2021, the Contra Costa County District Attorney filed an amended information charging Edwards with these three counts: (1) conspiracy to commit murder (Pen. Code² §§ 182, subd. (a)(1); 187) (count 1), with enhancement allegations that the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(5)) and that Edwards personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)); (2) the murder of Calderon-Lopez (§ 187, subd. (a)) (count 2), with enhancements alleging the special circumstance of murder by lying in wait (§ 190.2, subd. (a)(15)), the special circumstance that the murder was to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)), that Edwards personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) & (e)(1)), and that the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(5)); and (3) possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3). The information further alleged as to counts 1 and 2 that Edwards had been previously convicted of a violent felony, namely voluntary manslaughter in 2005 (§ 667.5).

Trial took place over approximately six weeks from November of 2020 until April of 2021. The prosecution's theory of the case was that Edwards had killed Calderon-Lopez after mistaking him for Alonso A., who lived two doors down from Calderon-Lopez and was a victim—and potential witness— in a then-pending case in which Jermaine Hicks, Sr., and Dorjan Hicks were charged with three counts of attempted murder.

---

² Subsequent undesignated statutory references are to the Penal Code.

4

Sergeant Steve Valle of the Oakland Police Department testified for the prosecution as an expert on the Ghost Town gang, and in his opinion, Edwards is a member of the Ghost Town gang. Valle testified that Edwards has a tattoo of the words "Ghost Town" with a grim reaper on his abdomen. Edwards's registered name on Facebook is WillBOP31, which in Valle's opinion was the moniker "Will BOP" and "31" for 31st Street, which is the start of the 3100 block on Martin Luther King Jr. Way—and the beginning of Ghost Town territory. BOP stands for "bounce out poppin'," which "is a slang term for somebody who is a shooter."

Detective Amanda Sears of the Contra Costa County Sheriff's Office testified as an expert on the North Richmond gang and criminal gangs generally. Sears testified that a subset of the North Richmond gang centered at 5th and Market was dominated by the Hicks family, including Jermaine Hicks, Sr., also known as "Slim," and Dorjan Hicks. In Sears's opinion, if a number of North Richmond gang members or associates had coordinated the killing of a witness, and a member of the Ghost Town gang killed the witness for the North Richmond gang, the crime would be at the direction of the North Richmond gang and would benefit that gang.

Minerva R. testified for the prosecution that she had a romantic relationship with Edwards from the third week of April to the second week of June of 2018. Minerva lived with Edwards at 509 Market Street from the last week of May until the beginning of June and would also stay with "on and off" at an apartment at 239 South 5th Street. In the last week of May, Minerva and Edwards came into possession of a black Jeep Cherokee through one of her friends. On the evening of May 31, 2018, Edwards and Minerva stayed at 509 Market Street, and Minerva initially parked the Jeep in front of that location that evening, but Edwards moved it down the street in front

5

of his mother's house. Edwards was "in and out" of the house throughout the night.

On June 1, 2018, Minerva was making coffee in the kitchen around 6:00 a.m.; Edwards was not there. Minerva heard "quite a few" gunshots, between five and eight or nine. She took her coffee and cigarettes, went outside, went back for her cigarette lighter, went outside again, opened the gate, turned right, and "bumped into Edwards at the corner," who was coming from the direction of Verde Street. Minerva estimated that she ran into Edwards "no more than a minute and a half" after hearing the gunshots. Minerva and Edwards then returned to the house to get ready for breakfast, walked to where the Jeep was parked, and drove past Richmond Parkway and MacDonald, where they ran into David Coyt. Coyt put some tools in the Jeep, and then left in his own car; he later returned to retrieve the tools, at which point Coyt borrowed the Jeep, which he returned later that day.

**The Verdict and Sentence**

On April 29, 2021, the jury found Edwards guilty on each count, including finding him guilty of first-degree murder on count 2. The jury also found true the enhancement that Edwards committed count 1 to benefit a criminal street gang (§ 186.22, subd. (b)(5)), and with respect to count 2, that Edwards intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15)); that he intentionally killed Calderon-Lopez while an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)); that a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)); and that the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(5)). The court

6

later found true allegation that Edwards had been convicted of voluntary manslaughter in 2005 (§ 667.5, subd. (a)).

On August 16, the trial court sentenced Edwards to life without the possibility of parole on the murder count with the special circumstance of lying in wait, and to life without the possibility of parole on the gang special circumstance, to run concurrently. On count 2, the court imposed a consecutive term of 25 years to life on the firearm enhancement (§ 12022.53, subd. (d)), a sentence of 15 years to life on the gang enhancement (§ 186.22, subd. (b)(5)), and stayed the latter sentence under section 654. The court struck the section 667.5 enhancement under section 1385. On count 1, the court imposed a sentence of 25 years to life, with 15 years to life on the gang enhancement (§ 186.22, subd. (b)(5)), and a sentence of two years on count 3. The court stayed the sentences on counts 1 and 3 and the gang enhancement on count 1 under section 654. The court struck the section 667.5 enhancement on count 3 under section 1385.

Edwards filed a notice of appeal.

## DISCUSSION

### The Prosecutor Did Not Commit Prejudicial Misconduct By Not Granting Use Immunity to David Coyt

#### Background

During trial and outside the presence of the jury, defense counsel twice indicated his intention to call Coyt to testify, and his concern that Coyt would invoke his Fifth Amendment right to remain silent and refuse to answer questions. Defense counsel also suggested that due process might require the prosecution to grant Coyt use immunity in order to for the defense to obtain his testimony, citing to *People v. Masters* (2016) 62 Cal.4th 1019 (*Masters*). The prosecutor told the court that he would not grant Coyt immunity,

7

because "there is no way to cabin off or somehow seal in a vacuum Mr. Coyt's morally turpitudinous conduct from his examination," explaining as follows:

"What I can tell you is that it's not just his open cases that's going to be relevant. What's going to be relevant is he says, look, I was—Mr. Coyt says, I was here this morning at June 1st, 2018, and I bumped into [Minerva R.], and Mr. Edwards wasn't with her. And then we arranged to meet up half an hour later, and we did, and I put tools in the back of her car, and I drove somewhere else, and then returned the Jeep.

"So I'm not—this is my work product, but I'm going to disclose it. It's—knowing what I know about Mr. Coyt, which is that he is a thief. He steals cars; he steals tools; he steals anything that he can get his hands on. And he, from what I can gather from his RAP sheet and his open cases, he does that every day, all day. So how he would remember this particular day of stealing is truly going to be a part of my cross-examination.

"And so the reality is, I'm not—it would be impossible. It would be malpractice for me to confine my questioning to June 1st of 2018 when I think he is mistaken in that he doesn't have a way to credibly remember to separate out the thieving days from the non-thieving days."

Later, again outside the presence of the jury, defense counsel called Coyt to testify. On the advice of counsel, Coyt invoked the Fifth Amendment and refused to answer any questions. The prosecutor declined to offer Coyt immunity. Coyt and his counsel were then excused from the courtroom.

Defense counsel argued that the prosecutor should be required to offer Coyt immunity under *Masters*, *supra*, 62 Cal.4th 1019.

The prosecutor indicated that Coyt had refused to give a recorded interview to the prosecution's investigator, although he gave two such interviews to the defense investigator. And the prosecutor then explained:

8

"I have marked as Coyt 2 both of the reports that [defense counsel] Mr. Feuerwerker is referencing. And I do want to have an in-camera hearing on these, or an ex parte hearing because there are parts of these reports that inform my decision not to give Mr. Coyt immunity. And those parts of my reasoning—aside from the fact that he would refuse to give a recorded interview, which is probably sufficient in and of itself, but let's assume it's not. There are parts of these reports that are my work product in terms of how I've analyzed them that lead me to want to express my reasoning to the Court, but it's work product, and I would not want to put that on the record in front of counsel and the defense because they expose case strategy."

The trial court indicated that it did not view Coyt's testimony as exculpatory, because it did not have to do with Edwards's location at the time of the shooting, but only with Minerva's credibility, and was therefore useful only for impeachment. The prosecutor further explained that he was not prepared to offer Coyt immunity on the ground that he had refused to speak with the prosecution on the record, and that there were statements Coyt had made to the defense investigator that were "easily provable as perjury," and it would not be in the interests of justice to offer immunity to a witness who was going to perjure himself.

The prosecutor requested an ex parte hearing in order to make a record of his reasons for believing that Coyt would commit perjury if offered immunity to testify. Over defense objection, the court indicated that it would hold the ex parte hearing and defense counsel left the courtroom. And in a short, sealed in camera hearing, the prosecutor explained his reasons, based on other evidence in the record, for believing that Coyt would commit perjury if offered immunity in exchange for his testimony.

9

After the ex parte hearing, the court concluded that based on the argument of counsel and the information provided ex parte, it would deny defense counsel's request to order the prosecution to grant Coyt immunity.

**The Applicable Law**

In *Masters*, *supra*, 62 Cal.4th 1019, our Supreme Court held that "California courts have no authority to confer use immunity on witnesses" (*id.* at p. 1051) and discussed federal case law—in particular *United States v. Quinn* (3d Cir. 2013) 728 F.3d 243 (en banc) (*Quinn*) and *Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964 (*Smith*)—standing for the proposition that, in certain circumstances, "due process may compel a defense witness to be immunized" by the prosecution. (*Masters*, p. 1051.) According to *Smith*, "[i]f a defendant can show that the prosecutor refused to grant immunity ' "with the deliberate intention of distorting the judicial factfinding process," ' a retrial is necessary." (*Masters*, p. 1051, quoting *Smith*, *supra*, 615 F.2d at p. 968.)

*Quinn* used five factors to evaluate whether a prosecutor's refusal to grant immunity amounted to prosecutorial misconduct: whether " ' "[1] [witness immunity was] properly sought in the district court; [2] the defense witness [is] available to testify; [3] the proffered testimony [is] clearly exculpatory; [4] the testimony [is] essential; and [5] there [are] no strong governmental interests which countervail against a grant of immunity." ' " (*Masters*, *supra*, 62 Cal.4th at pp. 1051–1052, quoting *Quinn*, *supra*, 728 F.3d at p. 251.)

*Masters* went on to explain that "[i]n California," by contrast, "the law regarding prosecutorial misconduct is settled: 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with

10

such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*Masters*, *supra*, 62 Cal.4th at p. 1052.)

In *Masters*, the witness to whom the prosecution ultimately refused to grant immunity—Richardson—had named several coconspirators in the murder, not including the defendant, but had refused to give a tape-recorded statement. (*Masters*, *supra*, 62 Cal.4th at pp. 1050, 1052.) Our Supreme Court explained why, "[e]ven if [it] were to assume" that *Quinn* "state[d] the appropriate test," defendant's "constitutional claim arising from the denial of witness immunity" was unpersuasive. (*Masters*, at p. 1052.) First, there was no "indication that Richardson would have testified that Masters was *not* involved in the murder. Although Richardson's out-of-court statements named several conspirators and did not name Masters, at no point did Richardson imply or state his list of conspirators was exhaustive. Richardson's statements did not *clearly* exculpate Masters." (*Ibid*.) And the court went on, "the prosecutor testified that the reason he did not offer Richardson immunity was that Richardson refused to give a tape-recorded statement. The prosecutor did not act on the basis of an improper motive in requiring Richardson to give a recorded statement before offering him immunity. Similarly, the prosecutor testified that another witness was offered immunity because his potential testimony was also corroborated by other evidence, but no evidence was presented to corroborate Richardson's statements. Masters failed to show there was no countervailing

11

governmental interest against granting immunity to Richardson." (*Id*. at p. 1053.)

Even assuming, as in *Masters*, that *Quinn* states the proper test for determining whether the failure to grant immunity to a witness amounts to prosecutorial misconduct, we find no misconduct under the circumstances of this case. Here, as in *Masters*, the witness at issue refused to give a recorded statement, or otherwise speak with the prosecution on the record, which *Masters* found was a proper motive for the prosecutor to decline to offer immunity. (*Masters*, *supra*, 62 Cal.4th at p. 1053.) Here, as in *Masters*, Coyt's testimony was not corroborated by other evidence—indeed, as the prosecutor indicated, it was contradicted by other evidence to the extent that the prosecutor believed Coyt would commit perjury if he testified. (*Masters*, p. 1053.) Finally, as in *Masters*, Coyt's proffered testimony was not *clearly* exculpatory. (*Masters*, p. 1052.) According to defense counsel, Coyt would testify that he did run into Minerva on the day of the shooting, but that she was initially alone, and it was not until half an hour later when he met up with both Minerva and Edwards. At most, this testimony would have impeached Minerva's credibility and provided a slightly different account of Edwards's whereabouts in the hours after the shooting. It was not clearly exculpatory under the test set forth in *Quinn*, *supra*, 728 F.3d 243.

**The Trial Court Did Not Violate Edwards's Constitutional Right to Counsel By Conducting the Ex Parte Hearing**

"[T]he trial court retains discretion to conduct in camera, ex parte proceedings to protect an overriding interest that favors confidentiality," including privileged attorney-client information and trial strategy. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1299; see *People v. Gurule* (2002) 28 Cal.4th

12

557, 593–594 [privileged attorney-client information]; *People v. Ayala* (2000) 24 Cal.4th 243, 261 [trial strategy].)

At the same time, "[a] criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial. . . . As to the right to counsel, a critical stage is one 'in which the substantial rights of a defendant are at stake' (*People v. Crayton* (2002) 28 Cal.4th 346, 362), and 'the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial' (*United States v. Wade* (1967) 388 U.S. 218, 227)." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465.) "More broadly, critical stages can be understood as those events or proceedings in which the accused is brought in confrontation with the state, where potential substantial prejudice to the accused's rights inheres in the confrontation, and where counsel's assistance can help to avoid that prejudice." (*Gardner v. Appellate Division of Superior Court* (2019) 6 Cal.5th 998, 1004–1005.)

Applying the above principles, we conclude that the ex parte hearing was not a "critical stage" of the proceeding at which the right to counsel attached. The jury was not present at the hearing, and no evidence of Edwards's guilt was introduced. The hearing—the transcript of which occupies only four pages—simply contained a brief explanation of the prosecutor's conclusion that Coyt's proffered testimony could not be true based on other evidence in the record. The subject of the hearing was not a surprise to defense counsel, who acknowledged his "understanding" that the prosecutor "needs to go in camera . . . to state" his reasons for finding a strong governmental interest countervailing against a grant of immunity. And the prosecutor told the court and defense counsel that he wanted the hearing in

13

order to "make my record" of his reasons for believing that Coyt would perjure himself if offered immunity.

Edwards does not identify any way in which the presence of his counsel at this hearing could have avoided prejudice to his rights, or even had any effect on the outcome. This is especially so since the trial court had already agreed with the prosecution that Coyt's proffered testimony was not clearly exculpatory, meaning that the *Quinn* test was not satisfied whether there was a strong governmental interest countervailing against a grant of immunity or not.

### Edwards Has Not Shown That The Prosecution's North Richmond Gang Expert Testified to Case-Specific Hearsay

#### Background

As noted, Detective Amanda Sears of the Contra Costa County Sheriff's Office testified as an expert on the North Richmond gang and criminal gangs generally. She testified that her gang expertise was generally based on having led or assisted in multiple gang investigations involving the North Richmond gang, having conducted surveillance and wiretaps related to the North Richmond gang, having conversations with other investigators regarding the North Richmond gang, having searched gang members' homes pursuant to search warrants or during probation and parole searches, having conducted arrests of North Richmond gang members, and having had numerous conversations with members of the gang, including informal conversations and formal interviews. Her testimony included the following exchange with the prosecutor:

"Q. And do you have historical knowledge or understanding of that particular area, 5th and Market in North Richmond?

"A. Yes.

"Q. Talk to us about that.

14

"A. Again, 5th and Market is kind of a stronghold for North Richmond. We've got the two markets that are on the main thoroughfares that are in North Richmond: 5th and Market and 5th and Chesley.

"5th and Market is well-known not only to North Richmond gang members but also to their rivalries because there's only a couple ways—I say a couple—maybe five or six ways in and out of North Richmond. That 5th and Market is right on one of the main thoroughfares, so people know exactly where it is. Narcotic sales are conducted there. Numerous shooting investigations occur right at that area.

"Q. And are there individuals who have historically to current, to now, been associated with 5th and Market, the stronghold in North Richmond?

"A. Yes.

"Q. Who are they?

"A. Historically, it's known that the Hicks family has essentially—

"MR. FEUERWERKER [defense counsel]: Judge, I'm going to object under Sanchez."

"THE COURT: Mr. DeFerrari, let's have a foundation for the knowledge.

"MR. DEFERRARI [prosecutor]: Sure.
"BY MR. DEFERRARI:

"Q. For this general history of North Richmond, how do you know historically the Hickses have claimed that as their area?

"MR. FEUERWERKER: Judge, it's still case-specific because of who is involved in the charging here.

"I mean, can we approach for a second, Judge?

"THE COURT: Yes.

15

(Whereupon, an off-the-record discussion was held at sidebar between Court and counsel.)

"THE COURT: The objection is overruled.

"Can you please reask the question.

"MR. DEFERRARI: Sure.

"BY MR. DEFERRARI:

"Q. Let's start back at the part of this here.

"Have there been people or families associated with 5th and Market, the stronghold you've described in North Richmond?

"A. Yes.

"Q. Who are they?

"A. Again, I've already mentioned the Hicks family. So you've got multiple members of the Hicks family that are associated: Jermaine Hicks, Dorjan Hicks. Mason Sherman is also a member of the Hicks family. Hassan Williams, who technically started as a PJT but also adopted 5th and Market."

Later on in Detective Sears's testimony, the following exchange took place:

"Q. Now I wanted to switch to a separate topic and specifically talk about some individuals related to this case.

"Are you familiar with Jermaine Hicks Sr.?

"A. Yes.

"Q. How so?

"A. I've investigated Mr. Hicks several times. I know him to be a North Richmond gang member associated with 5th and Market.

"Q. And is he pictured up on People's 199?

"A. Yes. He's in the top row in the white T-shirt.

"Q. Does he have a moniker or nickname?

16

"A. Nickname is Slim.

"Q. Are you familiar with an individual by the name of Dorjan Hicks?

"A. Yes.

"Q. How are you familiar with him?

"A. I've contacted Dorjan Hicks multiple times in the area of 5th and Market. I've observed him there. I know him to be a North Richmond gang member."

**Applicable Law**

In *Sanchez, supra*, 63 Cal.4th 665, our Supreme Court considered the propriety of an expert witness relating case-specific hearsay to the jury under the rules of evidence (*id.* at pp. 674–686) and among other things held that "[a]ny expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Id.* at p. 685; see Evid. Code, §§ 801, 802.) "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 686.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) As an example to clarify its holding, *Sanchez* explained: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Id.* at p. 677.)

17

**Analysis**

Edwards argues that although Sears "did not clearly say" how she learned the Hicks brothers were gang members, her opinion that they were must have been based on hearsay statements because she "did not relay any observation that would have provided a non-hearsay basis" for that conclusion. Although Sears did testify that she relied on some hearsay sources in forming her opinions, including conversations with gang members and other gang investigators, she did not identify any specific conversations or their participants or relay the contents of any specific hearsay statements to the jury as the basis for her opinions regarding the Hicks brothers.

As quoted, an "expert may still rely on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez, supra*, 63 Cal.4th at p. 685.) That is exactly what occurred in this case: Sears testified that the basis for her opinions generally also included several non-hearsay sources, including her experience having led investigations of the North Richmond gang, conducting surveillance of the gang and its territory, searching gang members' homes, and conducting arrests of gang members.

Edwards's argument fails because " ' "[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666, quoting *Denham v. Superior Court of Los Angeles* (1970) 2 Cal.3d 557, 564.) Because the record is silent as to the basis of Sears's opinion that the Hicks brothers were members of the North Richmond gang, we cannot presume that she relied on inadmissible hearsay. Sears did not testify to her basis for that particular opinion, and Edwards does not offer any citation to the record that establishes that she relied on inadmissible hearsay. In short, error has not been affirmatively shown.

18

(See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139–1140 [rejecting argument that expert must have violated *Sanchez* by relying on inadmissible hearsay contained in police reports where record was silent as to source of expert's information].)

**There Was No Cumulative Error**

Edwards argues that the cumulative effect of the errors he alleges denied him due process under the Fourteenth Amendment. "As we have found no substantial error in any respect, this claim must be rejected." (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

**Assembly Bill 333 Applies Retroactively to Edwards's Conviction and Requires the Gang Enhancements and Special Circumstance Be Reversed**

On January 1, 2022, while this appeal was pending, Assembly Bill 333 became effective, which amended section 186.22 to modify the definitions of "pattern of criminal gang activity" and "criminal street gang," and to clarify what is required to show an offense "benefit[s], promote[s], further[s], or assist[s]" a criminal street gang. (Stats. 2021, ch. 699, § 4.)

As noted, with respect to count 1, the jury found true the enhancement allegation that Edwards committed the crime to benefit a criminal street gang (§ 186.22, subd. (b)(5)), and with respect to count 2, the special circumstance that Edwards intentionally killed Calderon-Lopez while an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)), that the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(5)), and that a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)).

Edwards argues—and the Attorney General agrees[3]—that the amendments made by Assembly Bill 333 apply retroactively to his conviction and require that these enhancements and the special circumstance finding be reversed.

**Assembly Bill 333**

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) At the time of trial, a " 'criminal street gang' " was defined as "any *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill 333 narrowed the definition of " 'criminal street gang' " to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Assem. Bill 333, § 3;

---

[3] The Attorney General's brief, filed on October 12, 2023, argues that Assembly Bill 333 was an improper legislative amendment of section 190.2, subdivision (a)(22), which was enacted as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, an initiative measure adopted by the electorate at the March 2000 primary election. On December 18, 2023, our Supreme Court rejected this argument in *People v. Rojas* (2023) 15 Cal.5th 561, 580.

§ 186.22, as amended by Stats. 2021, ch. 699, § 4, eff. Jan. 1, 2022, italics added.)

Assembly Bill 333 also altered the requirements for proving the "pattern of criminal gang activity" necessary to establish the existence of a criminal street gang.  Formerly, a "pattern of criminal gang activity" was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  (Former § 186.22, subd. (e).)  Assembly Bill 333 redefined "pattern of criminal gang activity" to require that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational."  (Assem. Bill 333, § 3; § 186.22, as amended by Stats. 2021, ch. 699, § 4, eff. Jan. 1, 2022.)  In addition, the currently charged offense cannot be used as a predicate offense under the amendments.  (§ 186.22, subd. (e)(2).)

Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22.  Here, two other statutes that refer specifically to section 186.22 are implicated:  section 190.2, subdivision (a)(22) and section 12022.53, subdivision (e)(1).  Section 190.2, subdivision (a)(22) establishes a gang murder special circumstance:  "The defendant

21

intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Section 12022.53 provides for sentence enhancements for the use of firearms in the commission of an enumerated felony. The statute first provides for escalating punishments depending on how the firearm is used. The least severe penalty is set forth in section 12022.53, subdivision (b), which provides for a consecutive 10-year term for a defendant who "personally uses" a firearm in a felony. Next, a consecutive 20-year term is imposed under section 12022.53, subdivision (c), if the defendant "personally and intentionally discharges a firearm" in the commission of the offense. Finally, section 12022.53, subdivision (d) provides for a consecutive sentence enhancement of 25 years to life when the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death" during the commission of the offense.

While these subdivisions provide punishment for offenders who personally use a firearm during the commission of their crimes, the penalties may also be imposed on any person who is a principal in the offense under certain gang-related circumstances: First, the person who is a principal must be "convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" as set forth in section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1)(A).) Second, "[a]ny principal in the offense" must have "committed any act specified in subdivision (b), (c), or (d)," that is, any principal involved in the offense must

have personally used a firearm in the escalating use categories provided in section 12022.53, subdivisions (b) through (d). (§ 12022.53, subd. (e)(1)(B).)

**Analysis**

"When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*People v. Tran* (2022) 13 Cal.5th 1169, 1207.) If reversal is necessary, we remand the case to give the People an opportunity to retry the affected charges and allegations. (*People v. Cooper* (2023) 14 Cal.5th 735, 746–747.)

As the Attorney General concedes, the amendments made by Assembly Bill 333 apply retroactively to judgments not yet final on appeal on its operative date. (See *People v. Campbell* (2023) 98 Cal.App.5th 350, 376; *People v. Lopez* (2021) 73 Cal.App.5th 327, 343–344 (*Lopez*).) In this case, in order to prove that the North Richmond gang engaged in a "pattern of criminal gang activity" as required by section 186.22, subdivision (f), the prosecution presented evidence of three predicate offenses, the most recent of which was in 2013, which does not meet Assembly Bill 333's new requirement that the last of the predicate offenses occur within three years of the date of the current charged offense in 2018. As the Attorney General also concedes, this means the evidence was insufficient to establish that the North Richmond gang was a "criminal street gang" under Assembly Bill 333's new requirements and requires that the enhancements that depend on this finding be reversed. Accordingly, we must reverse the criminal street gang enhancements with respect to counts 1 and 2 (§ 186.22, subd. (b))(5)), and the gang special circumstance with respect to count 2 (§ 190.2, subd. (a)(22)).

With respect to the firearm enhancement on count 2, (§ 12022.53, subds. (d) & (e)(1)), the Attorney General agrees that the enhancement finding must be reversed to the extent it relies on section 12022.53, subdivision (e)(1), since that subdivision relies on the definition of "criminal street gang" found in section 186.22. It is unclear whether the jury's true finding on this enhancement was in fact based on section 12022.53, subdivision (e)(1). The information charged that "a principal personally and intentionally discharged a firearm, a handgun, which proximately caused great bodily injury and death to Taison Calderon-Lopez within the meaning of Penal Code section 12022.53[, subdivisions ](d) and (e)(1)," and the jury verdict form found true the allegation that "a principal personally and intentionally discharged a firearm" causing great bodily injury and death. However, the jury instructions stated that in order to find the enhancement allegation true, the jury had to find that "*the defendant* personally discharged a firearm" causing the death of a person (italics added), and the prosecutor argued during closing argument that "[t]he firearms enhancement means the defendant used a gun that caused great bodily injury or death," with no mention of the gang-related method of imposing the enhancement. At sentencing, the court imposed the 25-year-to-life sentence on the enhancement "pursuant to Penal Code section 12022.53[, subdivision ](d)," and only section 12022.53, subdivision (d) is listed as the basis for the enhancement on the abstract of judgment. Nevertheless, we will reverse the enhancement finding to the extent it was imposed under section 12022.53, subdivision (e)(1), leaving the finding under section 12022.53, subdivision (d) intact. (See *Lopez, supra*, 73 Cal.App.5th at pp. 347–348 [doing the same].)

24

## DISPOSITION

The conviction is affirmed. The gang enhancement allegation findings with respect to counts 1 and 2 (§ 186.22, subd. (b)(5)), the gang special circumstance with respect to count 2 (§ 190.2, subd. (a)(22)), and the gang-related firearm enhancement finding with respect to count 2, to the extent it was imposed under section 12022.53, subdivision (e)(1), are reversed. On remand, the People shall have the option to retry Edwards on these enhancements and the special circumstance. If they choose not to do so, the court shall resentence Edwards accordingly.

_____

Richman, Acting P. J.

We concur:

_____

Miller, J.

_____

Mayfield, J.*

*People v. Edwards* (A166128)

---

* Judge of the Superior Court of California, Mendocino County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.